**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------- X

BURGIOUS FRAZIER, JR., YOSUB KIM, WAYNE      :
KRUG, BEN PEREZ, VANESSA SZAJNBERG,      :
NICHOLAS TAPALANSKY, and SHELLY YIP,      :    No. 1:24-cv-2135
     :
         Petitioners,      :
     :
         -against-      :    **<u>NOTICE OF PETITION</u>**
     :
X. CORP f/k/a TWITTER, INC. and X HOLDINGS      :
CORP f/k/a X HOLDINGS I, INC.,      :
     :
         Respondents.      :
     :

----------------------------------------------------------------------- X

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT, upon the accompanying Petition, Memorandum of Law, and the Declaration of Akiva M. Cohen dated March 21, 2024, Petitioners Burgious Frazier, Jr., Yosub Kim, Wayne Krug, Ben Perez, Vanessa Szajnberg, Nicholas Tapalansky, and Shelly Yip respectfully move this Court for an Order, pursuant to 9 U.S.C. § 4, compelling Respondent to arbitrate Petitioners' claims in accordance with the terms of the parties' Dispute Resolution Agreement, including the provisions thereof that require Respondents to pay arbitral fees in accordance with the rules of JAMS in the absence of governing New York law mandating any other division of fees.

Per Local Rule 6.1(b), opposing affidavits and answering memoranda, if any, shall be served within fourteen days of service of the moving papers, and reply affidavits and memoranda of law shall be served within seven days after service of the answering papers.

Dated:  March 21, 2024
         New Brunswick, New Jersey                         Respectfully Submitted,

                                                  Kamerman, Uncyk, Soniker & Klein P.C.

                                                  _____/s/ Akiva M. Cohen_____
                                                  Akiva M. Cohen
                                                  Attorneys for Defendants
                                                  1700 Broadway
                                                  New York, New York 10019
                                                  (212) 400-4930
                                                  acohen@kusklaw.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- X

BURGIOUS FRAZIER, JR., YOSUB KIM, WAYNE : 
KRUG, BEN PEREZ, VANESSA SZAJNBERG, : 
NICHOLAS TAPALANSKY, and SHELLY YIP, : No.
 : 
Petitioners, : 
 : 
 : **PETITION**
-against- : 
 : 
X. CORP f/k/a TWITTER, INC. and X HOLDINGS : 
CORP f/k/a X HOLDINGS I, INC., : 
 : 
Respondents. : 
 : 

---------------------------------------------------------------------- X

1. This Petition to compel arbitration under 9 U.S.C. § 4 arises out of Respondents' bad-faith attempt to delay the arbitrations in which they required Petitioners to pursue their claims relating to Respondents' refusal to pay Petitioners the severance Respondents promised them and Petitioners earned.

2. The source of that delay is simple: Twitter, Inc. ("Twitter") required each of the Petitioners to sign an arbitration agreement (Twitter's form "Dispute Resolution Agreement," or "DRA") in order to accept employment with Twitter. In December, 2022, after other former Twitter employees brought a putative class action in the Northern District of California to address their claims to severance, Twitter successfully moved to compel to arbitration the claims of any employee – such as Petitioners – with an active DRA. But once they shunted the employees' claims to arbitration, Respondents stalled hundreds of them by simply refusing to pay the fees required to allow the arbitrations to proceed.

3. There is no basis for Respondents' refusal to pay the required fees. Petitioners' DRAs are crystal clear: their arbitrations are to be conducted at JAMS and according to JAMS's Employment Arbitration Rules & Procedures (the "JAMS Rules"), which mandate that employers

such as Twitter pay all of the arbitral fees for such arbitrations other than a small initial filing fee .
The DRAs also have an express provision addressing fees, which provides that fees will be
apportioned between Petitioners and Respondents in accordance with New York law; as discussed
in the accompanying Memorandum of Law, New York law does not mandate any particular
apportionment of fees, and confirms JAMS's authority to mandate that employers pay the vast
majority of the fees.

4.      Nor do Respondents have any good-faith basis to argue otherwise. Faced with
Respondents' plan of delay, and its position that the DRA required its employees to pay 50% of the
arbitral fees, Petitioners' colleague Zhang Yunfeng sought and obtained a construction of the DRA
from the arbitrator appointed to hear his case, retired Judge Frank Maas.

5.      After extensive briefing (*see* Exhibits 1-3 hereto) and oral argument, on November
30, 2023, Judge Maas rejected Respondents' arguments and held, in a Partial Final Award (Exhibit 4
hereto), that Twitter's DRA required Respondents to abide by the JAMS Rules and pay the fees.
Despite that, Respondents have not paid the fees for any of the claimants whose cases they have
stalled, insisting that each claimant must first extend the arbitral fees Respondents refused to pay, in
order to get a *separate* ruling from an arbitrator that the DRA requires Respondents to pay the fees.

6.      As discussed in Petitioners' accompanying Memorandum of Law, however, the
Court need not make itself an accessory to Respondents' attempt to grind its employees down
through delaying tactics. Section 4 of the Federal Arbitration Act gives the Court the power to
compel Respondents to arbitrate "in accordance with the terms [of the DRA]." Because Judge Maas
has already determined that the terms of the DRA require Respondents to pay fees as required by
JAMS's Rules, after a full and fair opportunity for Respondents to litigate the issue, Respondents are
estopped from arguing to the contrary in opposition to this Petition. Thus, the Court should direct

Respondents to arbitrate in accordance with the terms of the DRAs, including by paying the arbitral fees required by JAMS's Rules.

## THE PARTIES

Petitioners are citizens of the State of New York who were formerly employed by Twitter in New York, and who commenced arbitration with Respondents in New York. Copies of Petitioners' Demands for Arbitration are annexed hereto as Exhibits 5-11.

7. Respondent X Corp., f/k/a Twitter,[1] is a Nevada Corporation with a principal place of business in San Francisco, California, and a Respondent in Petitioners' arbitrations.

8. Respondent X Holdings Corp., f/k/a X Holdings I, Inc. is a Nevada Corporation with a principal place of business in San Francisco, California, and a Respondent in Petitioners' arbitrations.

## JURISDICTION AND VENUE

9. Jurisdiction is proper under 28 U.S.C. § 1331 and *Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009), in that Petitioners' underlying arbitration demands include claims under Federal law. Jurisdiction is also proper under 28 U.S.C. § 1332(a)(1) and (c)(2), in that the action is between citizens of different states and the amount in controversy is greater than $75,000.

10. Venue is proper in that 9 U.S.C. § 4 requires a Petition to compel arbitration be filed in a district in which jurisdiction would lie in the absence of the arbitration agreement, and in which the arbitration is to be held.

## THE DRA AND TWITTER'S ONBOARDING PROCESS

11. For years, Twitter has required its employees to execute a form DRA as a condition of employment.

---

[1] Despite the formal change of the company's corporate name and branding, it continues to be primarily known as "Twitter," rather than as "X." For the convenience of the Court and ease of understanding, Petitioners will continue to refer to it as "Twitter."

12.     The DRA states that it is governed by the Federal Arbitration Act and evidences a transaction involving commerce.

13.     It provides that "Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement." The DRA further provides that

> [e]xcept as it otherwise provides or required by law, this Agreement also applies, without limitation, to  disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair  competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

> Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

(emphasis in original).

14.     Twitter's practice was to send offer letters to successful job applicants.

15.     Twitter's offer letters explain the steps the applicant must take to accept a job offer, which include signing the DRA.

16.     Twitter uses Adobe Sign to collect electronic signatures on those employment documents.

17.     Twitter has largely automated the onboarding process for new employees, such that once the applicant submits executed documents through Adobe Sign, the documents are stored, Twitter's People Services team is notified, and a new Workday profile is created for the newly hired Twitter employee.

18.     This automated process requires the employee to execute the DRA.

19.     Therefore, execution of the DRA is a condition of employment.

20.     Since June 2018, the DRA has provided that the employee and Twitter agree to bring any arbitration claim before JAMS, pursuant to the then-current JAMS Rules.

21.     The DRA also contains a link to the Employment Arbitration Rules page, which in turn contains a link to the "Complete List of Rules & Procedures," including the Policy on Employment Arbitration Minimum Standards of Procedural Fairness" ("the Minimum Standards"). Rule 2 of the JAMS Rules provides that the parties to an arbitration can agree to any procedures not specified in the JAMS Rules, or otherwise alter the JAMS Rules, only if any such alterations are "consistent with the applicable law and JAMS policies (including without limitations, the []Minimum Standards . . . .")

22.     JAMS adopted its Minimum Standards effective July 15, 2009.

23.     The Minimum Standards apply to arbitrations based on a pre-dispute agreement that is required as a condition of employment.

24.     Minimum Standard No. 6 provides in pertinent part that "An employee's access to arbitration must not be precluded by the employee's inability to pay any costs or by the location of the arbitration. The only fee that an employee may be required to pay is JAMS' initial Case Management Fee. All other costs must be borne by the company, including any additional JAMS Case Management Fee and all professional fees for the arbitrator's services."

25.     Moreover, since at least June 1, 2021, the JAMS Employment Arbitration Rules & Procedures have provided in Rule 31(c) that "[i]f an Arbitration is based on a clause or agreement that is required as a condition of employment, the only fee that an Employee may be required to pay is the initial JAMS Case Management Fee."

### ELON MUSK'S DISRUPTIVE PURCHASE OF TWITTER, AND TWITTER'S EFFORTS TO REASSURE ITS EMPLOYEES

26.     In late March 2022, Elon Musk ("Musk") vocally criticized Twitter's content moderation decisions.

27.     Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company.

28.     Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

29.     On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale.

30.     Musk and Defendants executed a Merger Agreement later that day.

31.     The Merger Agreement contained the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

32.     Almost immediately, Twitter's employees began expressing concern about the security of their jobs if Musk purchased the company.

33.     Thereafter Twitter repeatedly reassured its employees its employees that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing

date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

34.     The merger closed on October 27, 2022.

**MUSK TAKES THE HELM, SLASHES STAFF, AND LITIGATION ENSUES**

35.     On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

36.     The first lawsuit related to Twitter's wrongful termination of its employees was filed that evening.

37.     On November 4, 2022, the layoffs at Twitter began. The severance offered in connection with these layoffs was far less than had been promised by Twitter's prior communications.

38.     In mid-November, Musk sent another email to Twitter's remaining employees. This email contained a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

39.     The layoffs and constructive terminations continued thereafter.

40.     After Musk assumed control of Twitter, it terminated nearly 6,500 employees.

41.     As a result, thousands of Twitter employees, including Petitioners, have filed arbitrations against Twitter with JAMS, seeking vindication of their common law and statutory rights.

## RESPONDENTS' REFUSAL TO ARBITRATE

42.     In the months after Twitter's former employees filed their arbitration demands, JAMS invoiced Defendants for their share of the initiation fees and indicated that JAMS had concluded that the Minimum Standards would apply to the arbitration.

43.      Defendants did not object to these statements, and instead, filed answers and affirmative defenses, paid their share of the case initiation fees, and participated in the selection of arbitrators.

44.     After proceeding in arbitration for several months, on June 2, 2023, Defendants began objecting to the application of the Minimum Standards, arguing that the DRA superseded the Minimum Standards.

45.     On June 21, 2023, JAMS rejected Defendants' objection.

46.     On June 28, 2023, Defendants wrote JAMS and indicated that they would refuse to proceed under the Minimum Standards, asserting that only an arbitrator could answer questions regarding the interpretation of the DRA.

47.     The practical effect of Defendants' position (and refusal to pay the arbitration fees) was to halt the progress of hundreds of arbitrations involving former Twitter employees who contended that they had been denied severance benefits which had been promised to them.

48.     In response, Plaintiff Zhang asked JAMS whether an arbitrator could consider a motion for an interim award to resolve the dispute if Mr. Zhang pre-paid Twitter's share of the fees for the motion.

49.     JAMS confirmed that, under those circumstances, an arbitrator could consider such a motion.

50.     On July 31, 2023, Mr. Zhang submitted a motion for an interim award to the arbitrator handling his case, retired Judge Frank Maas.

51.     On August 31, 2023, Defendants filed their response opposing Mr. Zhang's motion.

52.     On September 12, 2023, Mr. Zhang filed his reply brief in support of his motion.

53.     On October 25, 2023, Judge Maas heard oral arguments from the parties on Mr. Zhang's motion.

54.     On November 30, 2023, Judge Maas issued his Partial Final Award.

55.     In his Partial Final Award, Judge Maas found that

> Twitter employees . . . are required to sign the DRA electronically as a condition of employment even though they may opt out of its applicability if they choose to do so. The DRA, which contains mandatory arbitration language in Section 1, therefore constitutes 'an agreement . . . required as a condition of employment' within the meaning of JAMS Rule 31(c)."

(emphasis in Partial Final Award).

56.     After considering and rejecting Respondents' argument that the DRA mandated that the arbitral fees be split between Respondents and the employees, Judge Maas held that "Respondent Twitter, Inc., and Respondent X Holdings I, Inc. (as Twitter's affiliate, successor, subsidiary, or parent), will be required to pay all the JAMS fees and arbitrator fees (other than the initial case management fee) incurred in connection with this proceeding."

## FIRST CAUSE OF ACTION

(Compel Arbitration Pursuant to 9 U.S.C. § 4)

57.     Petitioners repeat and reallege the allegations of Paragraphs 1-56 of the Petition as though more fully set forth herein.

58. Petitioners executed their DRAs as part of Twitter's mandatory new-hire paperwork and employment agreement, comprised of their offer letters, Employee Invention Assignment and Confidentiality Agreement, and Code of Business Conduct and Ethics.

59. The DRA was – and was a part of – an agreement required as a condition of employment.

60. The DRA contains Twitter's agreement to arbitrate in accordance with JAMS's Rules.

61. JAMS's Rules require Twitter to pay all arbitral fees other than a $400 initial filing fee.

62. Respondents had a full and fair opportunity to litigate their contention that, given the opt-out provision in the DRA, such payment is not required by JAMS's Rules.

63. Both JAMS and Judge Maas have rejected Respondents' contention that such payment is not required by JAMS's Rules.

64. Respondents had a full and fair opportunity to litigate their position that the DRA does not contain their agreement to abide by JAMS's Rules with respect to the allocation of fees.

65. Respondents had a full and fair opportunity to litigate their position that the DRA in fact requires that such fees be allocated equally among the parties.

66. Judge Maas rejected Respondents' position that the DRA requires that such fees be allocated equally among the parties.

67. The DRA does not contain any provision reciting that fees for any arbitration are to be shared equally among the parties.

68. Nevertheless, Respondents have refused to proceed to arbitrate under the JAMS Rules.

69.     Nevertheless, Respondents have refused to pay the arbitral fees required of them under those rules.

70.     By so doing, Respondents have prevented the arbitrations from proceeding. Petitioners are aggrieved by Respondents' refusal to arbitrate in accordance with the terms of the DRA.

71.     As such, Petitioners are entitled to an Order compelling arbitration and specifically directing Respondents to abide by the terms of the DRA and pay the arbitral fees required by the JAMS Rules Twitter selected when it drafted the DRA.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request:

(a)  An Order compelling Respondents to arbitrate in accordance with the terms of the DRA, including by paying all arbitral fees required under the rules of their chosen arbitration provider; and

(b)  Such other and further relief as the Court deems right and proper.

Dated:  March 21, 2024
       New Brunswick, New Jersey

KAMERMAN UNCYK SONIKER &
   KLEIN, P.C.

By:  /s/ *Akiva M. Cohen*
Akiva M. Cohen
1700 Broadway
New York, New York 10019
(212) 400-4930

*Attorneys for Plaintiff*