# EXHIBIT 2

1    MORGAN, LEWIS & BOCKIUS LLP
     Eric Meckley, Bar No. 168181
2    eric.meckley@morganlewis.com
     Brian D. Berry, Bar No. 229893
3    brian.berry@morganlewis.com
     Kassia Stephenson, Bar No. 336175
4    kassia.stephenson@morganlewis.com
     One Market, Spear Street Tower
5    San Francisco, CA  94105-1596
     Tel:    +1.415.442.1000
6    Fax:    +1.415.442.1001

7    MORGAN, LEWIS & BOCKIUS LLP
     Ashlee N. Cherry, Bar No. 312731
8    ashlee.cherry@morganlewis.com
     1400 Page Mill Road
9    Palo Alto, CA  94304
     Tel:    +1.650.843.4000
10   Fax:    +1.650.843.4001

11   MORGAN, LEWIS & BOCKIUS LLP
     Sari M. Alamuddin, Bar No. 6215689
12   salamuddin@morganlewis.com
     110 North Wacker Drive, Suite 2800
13   Chicago, IL 60601
     Tel.:   +1.312.324.1000
14   Fax:    +1.312.324.1000

15   MORGAN, LEWIS & BOCKIUS LLP
     Kaiser H. Chowdhry, Bar No. 18076
16   kaiser.chowdhry@morganlewis.com
     1111 Pennsylvania Avenue, N.W.
17   Washington, D.C. 20004
     Tel:    +1.202.739.3000
18   Fax:    +1.202.739.3001

19   Attorneys for Respondents
     X CORP., as successor in interest to TWITTER, INC.,
20   X HOLDINGS CORP., as successor in interest to
     X HOLDINGS I, INC., and ELON MUSK
21

22                  **IN ARBITRATION BEFORE JAMS**

23   Yunfeng Zhang,                          JAMS Ref. No. 1601002342
                        Claimant,
24                                           **RESPONSE IN OPPOSITION TO**
                                             **CLAIMANT YUNFENG ZHANG'S**
25          v.                               **MOTION FOR AN INTERIM AWARD**
                                             **DECLARING THAT THE PARTIES'**
26   Twitter, Inc., X Holdings I, Inc., and Elon   **DISPUTE RESOLUTION AGREEMENT**
     Musk,                                   **REQUIRES RESPONDENTS TO PAY**
27                      Respondents.         **ALL COSTS UNIQUE TO**
                                             **ARBITRATION**
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Respondents X Corp. (as successor-in-interest to Twitter, Inc.), X Holdings Corp. (as successor-in-interest to X Holdings I, Inc.), and Elon Musk hereby oppose Claimant Yunfeng Zhang's Motion for an Interim Award Declaring that the Parties' Dispute Resolution Agreement ("DRA") Requires Respondents to Pay All Costs Unique to Arbitration (the "Motion").

## I.    INTRODUCTION

Claimant worked for Twitter in New York City.  Before he started, he agreed to arbitrate disputes pursuant to the DRA, which clearly states that arbitrator and arbitration fees will be apportioned between the parties if permissible under applicable law.  Claimant had a 30-day window in which he was free to opt out of the DRA entirely.  The contract emphasized in bold text: "**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.**"  Claimant never made use of this opportunity.  Yet now he asks the Arbitrator to rewrite the DRA's terms on fee apportionment to require Respondents to bear the full cost.  As explained below, Claimant's effort to revise the contract that he voluntarily accepted is without merit.

But the Arbitrator should not even resolve this issue because JAMS has no intention of adhering to the terms of the DRA.  It has repeatedly stated it will apply the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("Minimum Standards," reproduced as part of Exhibit 7 to the Cohen Declaration) unless the claimant waives their application, and that it reserves the right to make a final determination on the applicability of the Minimum Standards even if an arbitrator concludes they do not apply.  JAMS' position allows Claimant a chance to test the waters at no legal risk to himself.  If he succeeds and convinces the Arbitrator that the DRA requires Twitter to pay the full cost, he will argue that Twitter is bound by the Arbitrator's decision.  If he fails, he will contend that he is not bound by the Arbitrator's decision and can continue to refuse to waive the Minimum Standards.  By the same token, Twitter is in a no-win situation: regardless of what happens with his Motion, Claimant can continue to refuse to pay for this Arbitration.  Rather than indulge Claimant's strategy, this Arbitrator should at most consider anew whether the Minimum Standards even purport to apply here.  And because

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    they are expressly limited to agreements that are conditions of employment, and because the DRA

2    is expressly not a condition of employment, the answer is easy: the Minimum Standards do not

3    apply.  The Arbitrator should advise JAMS to reevaluate its earlier determination to apply the

4    Minimum Standards because that determination cannot be defended.

5            If the Arbitrator does proceed to resolve the substantive contract-interpretation issue

6    presented by the Motion, the Arbitrator should reject Claimant's arguments on their merits.

7    Claimant contends that even though he was a New York employee, his contractual rights are

8    governed by California law—in particular, the California Supreme Court's instructions for how to

9    interpret arbitration agreements in *Armendariz v. Foundation Health Psychcare Services, Inc.*, 6

10   P.3d 669 (Cal. 2000).  But he cites no authority for using *Armendariz* to interpret an arbitration

11   agreement entered into by a New York employee that requires arbitration in New York.  Nor

12   could he, as applicable choice-of-law principles plainly require construing such an agreement

13   under the FAA and New York law.  And it is settled under both the FAA and New York law that

14   fee-apportionment provisions are not inherently unlawful.  Claimant cannot attack the DRA's fee-

15   apportionment provision under New York standards and does not really try.  He instead puts

16   forward a convoluted argument that the DRA somehow incorporates the Minimum Standards

17   without saying so because of the JAMS General Counsel's opinion—issued years after the parties

18   entered into their contract—on how to interpret the Minimum Standards as governing the DRA.

19   But JAMS' mistaken opinion, which is contrary to the DRA's express terms, sheds no light on the

20   meaning of the parties' earlier agreement or their intent in entering into it.  In addition, among its

21   many other flaws, Claimant's reliance on *Armendariz* presumes that the DRA is a condition of

22   employment when, again, it clearly is not.  So, like the Minimum Standards, *Armendariz* does not

23   obligate Twitter to pay the full cost of this Arbitration even assuming California governed here,

24   which it does not.  The Arbitrator should deny the Motion in its entirety.

25   **II.    STATEMENT OF RELEVANT FACTS**

26       **A.    Claimant Assented to the DRA and Chose Not to Opt Out.**

27       On May 14, 2021, Claimant electronically signed the DRA.  DRA (attached to Claimant's

28   Arbitration Demand and as Exhibit 5 to the Cohen Declaration) at 3.  The DRA contains the

following relevant terms:

- Introductory Paragraph.  In a separate box at the top, the DRA contains bolded prefatory language stating that it "**is a contract and covers important issues relating to your rights**" and advising that employees are "**free to seek assistance from independent advisors of your choice.**"  DRA at 1.

- Not a Condition of Employment.  The Introductory Paragraph contains bolded language that states: "**You can choose to opt out of this Agreement – you have 30 days to opt out.**"  *Id.*  Section 8 also makes clear that "**[a]rbitration is not a mandatory condition of Employee's employment at the Company**."  *Id.* § 8 (emphasis in original).  An employee was free to opt out of the DRA by "**submit[ting] a form stating that the Employee wishes to opt out and not be subject to this Agreement**."  *Id.* (emphasis in original).  If the employee did not timely opt out of the DRA within 30 days, the agreement explained that "continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement…" *Id.*

- Governing Law.  The DRA expressly states that it is "governed by the [FAA] and evidences a transaction involving commerce." *Id.* § 1.

- Commitment to Arbitrate Claims.  The DRA states that it is "intended to apply to the resolution of disputes that otherwise would be resolved in a court of law" and "requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial." *Id.*

- JAMS Rules.  The DRA states that the "Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules," without reference to the Minimum Standards, which are applicable only to arbitration agreements that are a mandatory condition of employment.

- Arbitration Fees.  The DRA states that "in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees.  If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such

fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator." *Id.* § 6.

## B.   The Arbitration Proceedings

### 1.   Claimant Files a Demand for Arbitration Following His Layoff.

Claimant resides in Chappaqua, New York, and worked at Twitter's New York Office. Arbitration Demand ¶ 15.  He accepted his position on or about May 14, 2021, began work on or about June 21, 2021, and worked for Twitter until he was laid off on February 2, 2023.  *Id.* ¶ 22.

On or about February 13, 2023, Claimant filed a demand for arbitration with JAMS. Arbitration Demand at 4.  Citing the DRA's provision governing the location of arbitration, he requested that the location of the arbitration take place within 45 miles of his Chappaqua, New York residence.  *Id.*; *see* DRA § 3 ("The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.").  Claimant ticked the box on JAMS' form asserting that he was **not** bringing a "consumer arbitration."  Arbitration Demand at 5.  The form defines "consumer arbitration" to encompass "an arbitration conducted under a pre-dispute arbitration provision contained in a contract" that "[a]n employee or an applicant for employment" was "required to accept" and that was drafted by the other party to the contract.  *Id.*

### 2.   JAMS Determines That Its Minimum Standards Apply Regardless of the Arbitrator's Determination, in Conflict with the DRA's Terms.

On June 2, 2023, Twitter requested that arbitration costs in approximately 900 demands[1] pending with JAMS be apportioned equally between the parties for arbitrations in jurisdictions where fee-sharing is lawful.  Cohen Decl., ¶ 7 & Ex. 6.  Twitter cited Section 6 of the DRA:

> [I]n all cases where required by law, the Company will pay the Arbitrator's and arbitration fees.  If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

*Id.*

---

[1]   Two other law firms, in addition to Claimant's counsel, have filed the approximately 900 similar demands that are subject to the fee-sharing dispute.

On June 21, 2023, JAMS Senior Vice President and General Counsel Sheri Eisner wrote a letter in response (the "June 21 Letter").  *See* Dkt., uploaded 6/27/2023.  She stated that the Minimum Standards apply "separate and apart from the protections that may apply in any given jurisdiction" and "notwithstanding any contrary provision in the parties' arbitration agreement."  *Id.*  The June 21 Letter explained that while "[t]he Minimum Standards do not prevent an employee from contributing to JAMS fees," JAMS would continue to issue invoices in accordance with the Minimum Standards absent employee agreement.  Finally, she stated that, although the parties could direct any further dispute about the applicability of the Minimum Standards to the assigned arbitrator in each case, JAMS would retain the right to "make a final determination" on the issue.  *Id.*  This contradicts the plain language of the DRA, which as noted states explicitly that the Arbitrator will resolve any disputes over fee apportionment.  DRA § 6.

On June 28, 2023, Twitter replied that the June 21 Letter "prevents Twitter from exercising its contractual rights and improperly negates a material provision in the dispute resolution agreements should Twitter proceed in accordance with [the] decision."  *See* Dkt., uploaded 6/29/2023.  Rather than abandon its rights under the DRA, Twitter declined to proceed under the Minimum Standards—but did not decline to arbitrate—for demands in jurisdictions where fee-sharing is lawful.  *Id.*  Twitter's letter identified this Arbitration as one of the arbitrations in a jurisdiction where fee-sharing is lawful.  *Id.*

Then, on June 30, 2023, JAMS' General Counsel wrote again to the parties, observing that employees could elect to contribute to JAMS fees.  *See* Dkt., uploaded 6/30/2023.  The letter stated that if a claimant wished to waive the Minimum Standards and "share JAMS fees according to the underlying arbitration clause, they should advise JAMS and Respondent accordingly."  *Id.*

### 3.   Claimant Asks the Arbitrator to Interpret the DRA Even Though JAMS Has Repeatedly Stated it Retains Ultimate Authority Over the Question.

Claimant declined to waive the Minimum Standards in response to the General Counsel's June 30, 2023 letter.  Instead, on July 2, 2023, he emailed JAMS Arbitration Practice Manager

1    Sarah Nevins to propose advancing $5,000, to be pooled with Twitter's prior deposit of $5,000, to

2    fund a ruling by the Arbitrator on whether the DRA requires Respondents to pay all arbitration

3    costs in this matter.  Cohen Decl., ¶ 13 & Ex. 12.  Twitter objected to this proposal because

4    JAMS has already made clear that it asserts authority to make the final determination on this

5    question, regardless of the terms of the DRA.

6            In a July 12, 2023 letter to the parties (the "July 12 Letter"), JAMS Senior Vice President

7    Elizabeth Carter responded: "If any Claimant agrees to contribute to JAMS fees to proceed in

8    arbitration—including for the purpose of having an arbitrator rule on the parties' respective

9    obligations under applicable law and the terms of the arbitration agreement—JAMS will proceed

10   to administer the matter accordingly."  *See* Dkt., uploaded 7/12/2023.  At the same time, however,

11   the July 12 Letter reiterated JAMS' position that it would "continue to apply the Minimum

12   Standards in these matters irrespective of an arbitrator's ruling on the parties' obligations under

13   applicable law and the terms of the arbitration agreement."  *Id.*  At most, JAMS stated that it

14   would "tak[e] the arbitrator's position into consideration," and "make a final determination" for

15   itself if the "arbitrator believes JAMS should revisit the decision to apply the Minimum Standards

16   in a given case—for example, if an arbitrator believes the arbitration agreement was negotiated or

17   not a condition of employment."  *Id.*

18           The parties held a videoconference with the Arbitrator on July 19, 2023, and in

19   accordance with the Arbitrator's orders, now submit briefing on Claimant's request for an interim

20   award on fees payment.  Per the Arbitrator's July 19, 2023 order, this submission "shall not be

21   deemed a waiver of any of the Respondents' rights with respect to this case."

22   **III.   ARGUMENT**

23       **A.   Because JAMS Refuses to Adhere to the Terms of the DRA and Abide by the**
24            **Arbitrator's Determination, the Arbitrator Should Not Entertain Claimant's**
             **Motion.**
25
             **1.   JAMS Has Decided to Apply the Minimum Standards as an**
26               **Administrative Decision and to Treat the Substance of the Parties'**
                 **Contractual Obligations as Academic.**
27

28   The premise of Claimant's Motion is that the dispute over fee apportionment is a run-of-

the-mill contractual dispute rather than a matter of arbitration administration.  While the premise would make sense if the parties were writing on a blank slate, the problem here is that JAMS has already opined to the contrary.  Its June 21 Letter made clear that "[t]he Minimum Standards reflect JAMS administrative policy"—a policy that stands "separate and apart from" the law in any given jurisdiction and that governs "notwithstanding any contrary provision in the parties' arbitration agreement."  Under Rule 6 of the JAMS Employment Rules & Procedures, JAMS may convene "administrative conferences to discuss any procedural matter relating to the administration of the Arbitration," and "may order the suspension or termination of the proceedings" if "any Party has failed to pay fees or expenses in full."  In addition to stating that it will treat the Minimum Standards as an administrative policy that applies regardless of contrary law or contract terms, JAMS has repeatedly stated that it retains the prerogative to make a "final determination" on the issue—even if the Arbitrator "advise[s]" JAMS that it should revisit its decision to apply the Minimum Standards.  *Id.*, Exs. 10, 12.  So long as JAMS believes that the Minimum Standards should apply, the only way to move forward in arbitration is for a claimant to waive the application of Minimum Standard No. 6 concerning payment of arbitration-related costs.  *See id.*  Otherwise, a claimant could go to court, as the JAMS Minimum Standards contemplate.  *See* Minimum Standards at 4 ("If a party contests the enforceability of a pre-dispute arbitration agreement that was required as a condition of employment, and if compliance with the Minimum Standards is in question, JAMS will, if given notice of the dispute, defer administering the arbitration for a reasonable period of time to allow the contesting party to seek a judicial ruling on the issue.").  A claimant could, for example, argue under 9 U.S.C. § 4 for an order compelling arbitration under the terms of the agreement—if the claimant could establish that the DRA requires adherence to the Minimum Standards—or request appointment of a different arbitration provider under 9 U.S.C. § 5.  *See, e.g., Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1013 (9th Cir. 2004); *Khan v. Dell Inc.*, 669 F.3d 350, 354 (3d Cir. 2012).

Because JAMS currently will not deviate from its administrative policy of applying the Minimum Standards based on the DRA's content, any purported dispute over the meaning of the DRA is academic—not ripe for resolution.  It does not matter what the DRA requires, according

1    to JAMS, as JAMS plans to apply the Minimum Standards regardless.

2       Claimant's Motion thus seeks to create a situation he cannot lose. If Respondents

3    persuade the Arbitrator that the DRA really does obligate Claimant to pay half the arbitration

4    costs, Respondents remain no better off than before because JAMS will give no effect to the

5    Arbitrator's interpretation of the DRA. Conversely, if Claimant convinces the Arbitrator of the

6    opposite view, Claimant is dramatically better off than before because he could confidently agree

7    to waive Minimum Standard No. 6 knowing that the interim award would be law of the case and

8    would require the same result as the Minimum Standards.[2]

9       Unless and until JAMS reconsiders its announced intention not to treat a ruling by the

10   Arbitrator as determinative, the Arbitrator should refuse to issue what, by JAMS' own

11   description, would be a mere "advis[ory]" opinion. The requirements of the DRA present no live

12   controversy for the parties, because currently they have no potential to alter the parties' rights

13   moving forward. Claimant has never asked JAMS to reconsider its stated intention of retaining

14   the right to disregard the Arbitrator's ruling, even though that stated intention is plainly

15   irreconcilable with the terms of the DRA itself. *See* DRA § 6 ("If under applicable law the

16   Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be

17   apportioned between the parties in accordance with said applicable law, and **any disputes in that**

18   **regard will be resolved by the Arbitrator**." (emphasis added)). Nor has Claimant pledged to

19   waive the Minimum Standards should the Arbitrator find that they are inconsistent with the

20   DRA's terms. If Claimant sincerely wanted to follow the terms of the DRA, he would state an

21   intent to do these things. He would not be playing a game of heads-I-win-tails-you-lose.

       **2.**      **At Most, the Arbitrator Should Request That JAMS Reconsider its**
22                 **Administrative Decision to Apply the Minimum Standards Because**
23                 **They are Facially Inapplicable to the DRA.**

24       According to JAMS, the Arbitrator's only role at this juncture is to "advise" JAMS if the

25   Arbitrator "believes JAMS should revisit the decision to apply the Minimum Standards in a given

26

---

[2]    Claimant even suggests that his counsel would try to leverage such a ruling through collateral
27    estoppel in arbitrations with other claimants. Mot. 2 n.2. While the collateral-estoppel effect
     of a potential interim award here is not an issue for the Arbitrator to decide, Respondents
28    strongly disagree with any suggestion that collateral estoppel might apply.

case—for example, if an arbitrator believes the arbitration agreement was negotiated or not a condition of employment." Cohen Decl., Ex. 12. If the Arbitrator does not reject Claimant's request for an advisory opinion out of hand, the most the Arbitrator should do at this point is advise JAMS to revisit its decision.

The Minimum Standards, on their face, apply only to required conditions of employment, and as JAMS' July 12 Letter seemingly anticipates, the DRA is "not a condition of employment." The opening paragraph of the Minimum Standards state that they "apply to arbitrations based on pre-dispute agreements that are required as a condition of employment." Minimum Standards at 2; *see id.* ("If an arbitration is based on a clause or agreement that is required as a condition of employment, JAMS will accept the assignment only if the proceeding complies with the Minimum Standards of Procedural Fairness for Employment Arbitration."); *see also, e.g.*, *Selman v. FCB Worldwide Inc.*, No. B168315, 2004 WL 2729656, at *3 (Cal. Ct. App. Dec. 1, 2004) (unpublished) ("JAMS [Minimum] Standard 6 . . . appl[ies] only to arbitration agreements that are required as a condition of employment.").[3] As the DRA express states in bolded text, "**Arbitration is not a mandatory condition of Employee's employment at the Company**." DRA § 8. Rather, employees had 30 days after their receipt of the DRA "**to opt out and not be subject to this Agreement**." Such employees would "not be subject to any adverse employment action as a consequence of that decision and [could] pursue available legal remedies without regard to [the DRA]." *Id.* Numerous Twitter employees made use of this opportunity to opt out of the DRA—and some of those employees are now pursuing litigation in federal court—but Claimant did not opt out of the DRA.

Indeed, this type of opt-out provision is a quintessential example of the sort of an arbitration agreement that, according to courts across jurisdictions, is **not** a condition of employment. *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016) ("[A]n arbitration agreement is not adhesive if there is an opportunity to opt out of it."); *Young v.*

---

[3]   The JAMS Rules likewise prohibit fee-splitting only when the "Arbitration is based on a clause or agreement that is required as a condition of employment." JAMS Rule 31(c); *see Selman*, 2004 WL 2729656, at *3.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    *Refined Techs., Inc.*, No. 22-cv-1032, 2022 WL 3012536, at *5 (C.D. Cal. June 17, 2022)

2    (referring to "an opt-out provision" as "[o]ne of the typical indicia that a contract is not a

3    condition of employment"); *Essex v. Children's Place, Inc.*, No. 15-cv-5621, 2017 WL 6000347,

4    at *5 (D.N.J. Dec. 4, 2017) ("Plaintiffs were not required to participate in TCP's arbitration

5    program as a condition of employment with TCP. . . . [T]he Arbitration Agreement expressly

6    state[s] that signing the Arbitration Agreement is not a mandatory condition of employment. . . .

7    To the contrary, the Arbitration Agreement has a clear 'opt out' provision."); *Rodriguez v. Four

8    Seasons Hotels, Ltd.*, No. 09-cv-2864, 2009 WL 2001328, at *4 (S.D.N.Y. July 10, 2009)

9    ("[Plaintiff] was not required to submit to the . . . mediation/arbitration provisions as a condition

10   of employment, but was provided with the choice of opting-out.").

11          Claimant suggests in a footnote that the Minimum Standards apply on the theory that

12   "**execution** of the DRA [was] a condition of employment."  Mot. 12 n.8 (emphasis added).  He

13   also suggests that having to request and return an opt-out form by email was too much of a "series

14   of procedural hurdles" to qualify as a meaningful opt-out opportunity.  *Id.*  But both these

15   arguments conflict with governing precedent, and Claimant cites nothing to support them.

16          For example, in *Simeon v. Domino's Pizza LLC*, the court easily rejected an

17   indistinguishable argument by a plaintiff who "was required to sign the Agreement 'in order to

18   commence or continue' his employment" because it "ignore[d] the rest of the agreement which

19   explicitly allowed him to opt out within 30 days **and still retain his employment**."  No. 17-cv-

20   5550, 2019 WL 7882143, at *5 (E.D.N.Y. Feb. 6, 2019) (emphasis in original).  As a result, "the

21   plain terms of the Arbitration Agreement . . . ma[de] clear that dispute resolution by arbitration

22   [was] not a mandatory condition of [the plaintiff's] employment."  The same is true here.

23   Moreover, Claimant mischaracterizes the language of the Minimum Standards in advancing this

24   argument.  Contrary to his description, the Minimum Standards do not purport to "apply

25   whenever an arbitration is required by a standard 'clause **or agreement**' that an employer

26   requires an employee to sign as a condition of employment."  Mot. 12 n.8 (emphasis in original).

27   They purport to apply "[i]f an arbitration is based on a clause or agreement that is required as a

28   condition of employment."  Minimum Standards at 2.  The DRA was not "required as a condition

-10-

1  of employment." *Id.* Just the opposite, its opt-out procedure expressly enabled Claimant to

2  choose to "**not be subject to this Agreement**." DRA § 8 (emphasis in original).[4]

3  Claimant's passing reference to supposed "procedural hurdles" fares no better. In

4  *Mohamed*, the Ninth Circuit rejected a similar argument—though on far more compelling facts—

5  that a "right to opt out was not 'meaningful' because drivers were required to opt out either in

6  person at Uber's San Francisco offices or by overnight delivery service." 848 F.3d at 1210-11.

7  The court reached this decision even though it did "not doubt that it was more burdensome to opt

8  out of the arbitration provision by overnight delivery service than it would have been by e-mail."

9  *Id.* at 1211. The email procedure here was far less burdensome than the one in *Mohamed*.

10  In short, the Minimum Standards apply only to agreements required as a condition of

11  employment, the DRA was not required as a condition of employment, and thus there is no basis

12  to treat the Minimum Standards as applicable. Before the Arbitrator entertains Claimant's

13  contractual arguments about the meaning of Section 6 of the DRA, the Arbitrator should advise

14  JAMS to reconsider its earlier determination. Were JAMS to agree with such advice, at least then

15  Claimant would not be able to seek a no-risk advisory opinion from the Arbitrator on what the

16  DRA requires. Claimant, instead, would be bound by what the DRA requires.

17  **B.  If the Arbitrator Addresses the Substance of Claimant's Contract-Interpretation Arguments, the Arbitrator Should Reject Them.**

19  **1.  Federal and New York Law Govern the Parties' Fee Obligations.**

20  Claimant's Motion gives remarkably little attention to the threshold question of what law

21  governs the issue presented. As framed by the Motion itself, the issue at hand is the meaning of

22  the DRA. *See* Mot. 2 ("Claimant . . . brings this motion for an interim award . . . construing the

23  parties' DRA and ruling that Respondents are contractually required to abide by the Minimum

24  Standards."). The DRA answers that threshold choice-of-law question in the first two sentences

25  of Section 1: "This Agreement is governed by the Federal Arbitration Act . . . . If the FAA is

---

[4]  Claimant also mischaracterizes Twitter's submission in *Cornet v. Twitter, Inc.*, No. 22-cv-6857 (N.D. Cal.). Mot. 12 n.8 (citing Cohen Decl., Ex. 2). In fact, Twitter emphasized in that submission that "[a]ll Versions of the Agreement expressly state that '[a]rbitration is not a mandatory condition of Employee's employment at the Company' and advises employees of their right to opt out of the Agreement." Cohen Decl., Ex. 2 at 13.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   found not to apply, then this Agreement is enforceable under the laws of the state in which you

2   . . . are employed at the time you enter into this Agreement."  DRA § 1.  Because there is no

3   dispute that Claimant lived and worked in New York at all relevant times, *see* Arbitration

4   Demand ¶ 15, the only applicable laws are the FAA and New York law.  The FAA presumptively

5   applies, but if it "is found not to apply" to the fee-apportionment provision in Section 6, then New

6   York law applies by Section 1's plain terms.  In no event is the DRA governed by the law of the

7   state in which Twitter is headquartered, California, contrary to what the Motion suggests.

8          Claimant appears to have overlooked this express language in arguing that the DRA has

9   no choice-of-law clause.  *See* Mot. 14.  The basis for Claimant's argument seems to be that

10  Section 3, which sets the location for the arbitration, is not a choice-of-law provision.  Claimant

11  gives no reason, however, for disregarding Section 1.

12         If Section 1 were not a choice-of-law provision, which it plainly is, the choice-of-law

13  issue would turn on "the choice-of-law doctrine of the forum state, here, New York."  *Guan v.*

14  *Uber Techs., Inc.*, 236 F. Supp. 3d 711, 721 (E.D.N.Y. 2017).  "Under New York's choice-of-law

15  rules, the court evaluates the center of gravity or grouping of contacts," with the purpose of

16  establishing which state has "the most significant relationship to the transaction and the parties."

17  *Id.* (citations and quotations omitted).  Here, the relevant factors point strongly to New York

18  because New York was the place of contracting (where Claimant signed the DRA and declined to

19  opt out), the place of performance (where arbitration between the parties is set to occur), the

20  location of the subject matter (the employment and related arbitrations), and the domicile and

21  place of business of the parties (Claimant's New York residence and Twitter's New York

22  location).  The only fact pointing the other way is that Twitter was headquartered in California.

23  But that one countervailing factor does not tilt the balance in favor of California law.  *See, e.g.*,

24  *Guan*, 236 F. Supp. 3d at 722 ("Plaintiffs are drivers in New York who signed up to use the Uber

25  App to receive transportation requests in New York.  The issues in dispute involve contract

26  formation and employment practices in New York, which implicate significant State policy

27  interests.").

28         Claimant contends that his FEHA rights are governed by California law and that "New

York law does not address FEHA." Mot. 15. This conflates two separate choice-of-law questions: (1) which law governs the interpretation of the DRA (the issue presented in his Motion); and (2) which law governs the substance of his employment discrimination claims (an issue potentially to be decided at some later stage). The substance of Claimant's employment discrimination claim is not before the Arbitrator right now. Only the interpretation of the DRA is.

In any event, California law does **not** govern Claimant's claim for employment discrimination (Count Seven of the Arbitration Demand) because he lived and worked in New York and fails to show that any relevant conduct occurred in California. His argument on this point rests entirely on *Sims v. Worldpac Inc.*, No. 12-cv-5275, 2013 WL 663277, at *2 (N.D. Cal. Feb. 22, 2013), which merely denied a motion to dismiss a FEHA claim brought by a non-Californian, and in doing so emphasized that the plaintiff had plausibly "identif[ied] the individuals who engaged in the alleged discriminatory and retaliatory conduct" and plausibly alleged that they engaged in the allegedly tortious conduct while located in California. *Id.* at *3. The court recognized, however, that "the fact that the employer's headquarters were in California" is not enough to trigger FEHA, and that "general" "allegations that the decision to terminate [a plaintiff] was approved, implemented and ratified in California" are "insufficient to establish a nexus between the alleged discrimination and California." *Id.* at *2-3 (citing *Campbell v. Arco Marine, Inc.*, 42 Cal. App. 4th 1850, 1858 (1996), and quoting *Gonsalves v. Infosys Techs., LTD.*, No. 09-cv-04112, 2010 WL 1854146, at *6 (N.D. Cal. May 6, 2010)). Claimant's allegations, in contrast, do not identify any specific decisionmakers who engaged in allegedly unlawful acts in California but instead rest on the same sort of highly general allegations found insufficient in these and other cases. Arbitration Demand ¶ 188; *see, e.g.*, *Gulaid v. CH2M Hill, Inc.*, No. 15-cv-4824, 2016 WL 926974, at *4 (N.D. Cal. Mar. 10, 2016) (rejecting plaintiff's reliance on *Sims* because plaintiff failed to "specifically identify connections between the alleged discriminatory conduct and the activities of particular employees of defendants in California"); *Loza v. Intel Ams., Inc.*, No. 20-cv-6705, 2020 WL 7625480, at *4 (N.D. Cal. Dec. 22, 2020) (same). In all events, Section 1 of the DRA provides that New York applies, and New York choice-of-law principles would apply New York discrimination law to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Claimant's claims regardless because "the alleged discriminatory acts . . . occurred during his

2    employment in New York."  *Cagle v. Unisys Corp.*, No. 99-cv-9575, 2003 WL 21939705, at *7

3    (S.D.N.Y. Aug. 13, 2003).[5]

4              **2.      Neither the FAA Nor New York Law Requires Twitter to Pay
                        Claimant's Share of the Arbitration and Arbitrator Fees, and so the
5                       DRA Requires the Parties to Split the Fees.**

6              Under the applicable federal and New York law, and on the record before the Arbitrator,

7    Twitter has no obligation to pay the full costs of this Arbitration.  Under federal law, the Supreme

8    Court has at most adverted to the possibility that an arbitration agreement might operate as an

9    invalid "prospective waiver of a party's right to pursue statutory remedies" if "filing and

10   administrative fees attached to arbitration . . . are so high as to make access to the forum

11   impracticable."  *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) (citation omitted);

12   *see also Green Tree Fin. Corp.—Ala. v. Randolph*, 531 U.S. 79, 90 (2000).  Yet the Court warned

13   that "the fact that it is not worth the expense involved in proving a statutory remedy does not

14   constitute the elimination of the **right to pursue** that remedy."  *Italian Colors*, 570 U.S. at 236

15   (emphasis in original).  Courts have widely held "that some showing of individualized prohibitive

16   expense is necessary to invalidate an arbitration agreement."  *Stewart v. Paul, Hastings, Janofsky

17   & Walker, LLP*, 201 F. Supp. 2d 291, 293 (S.D.N.Y. 2002); *see also, e.g.*, *Bradford v. Rockwell

18   Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001) ("[T]he appropriate inquiry is one

19   that evaluates whether the arbitral forum in a particular case is an adequate and accessible

20   substitute to litigation, i.e., a case-by-case analysis that focuses, among other things, upon the

21   claimant's ability to pay the arbitration fees and costs, the expected cost differential between

22   arbitration and litigation in court, and whether that cost differential is so substantial as to deter the

23   bringing of claims.").  And where a plaintiff fails to make any individualized showing of an

24   inability to pay, courts have refused to strike down fee-splitting agreements.  *Stewart*, 201 F.

25   Supp. 2d at 293-94; *Bradford*, 238 F.3d at 558-59; *Gordon v. Wilson Elser Moskowitz Edelman &*

26

27   ---

     [5]    Entirely separately, it appears from the allegations in the Arbitration Demand that the
            Arbitrator would not even possess jurisdiction over a FEHA claim by Claimant because he
28          has not alleged that he has exhausted his administrative remedies for such a claim.  *See, e.g.*,
            *Kim v. Konad USA Distrib., Inc.*, 226 Cal. App. 4th 1336, 1345 (2014).

1    *Dicker LLP*, No. 22-cv-5212, 2023 WL 2138693, at *6 (S.D.N.Y. Feb. 21, 2023).

2         New York law follows the same basic approach.  *See, e.g.*, *Brady v. Williams Cap. Grp.,*

3    *L.P.*, 928 N.E.2d 383, 387 (N.Y. 2010) (citing *Gilmer* and *Bradford*, among other cases, in

4    endorsing "the case-by-case, fact-specific approach employed by the federal courts").  Just as

5    under the FAA, a failure to put forward meaningful evidence dooms an employee's attempt to

6    avoid fee-splitting under New York law.  *See, e.g.*, *Am. Fam. Life Assurance Co. of New York v.*

7    *Baker*, 778 F. App'x 24, 27 (2d Cir. 2019); *Mariglio v. Berthel Fisher & Co. Fin. Servs.*, 133

8    A.D.3d 1371 (N.Y. App. Div. 2015).

9         There is no evidence here to meet these standards.  Indeed, Claimant has already advanced

10   $5,000 to fund consideration of this Motion and provides no evidence from which the Arbitrator

11   could conclude that further funding half of the arbitration costs would be cost-prohibitive for him

12   (or his counsel, who may have agreed to pay such costs as part of a contingency fee arrangement)

13   relative to the cost of litigating.  His Motion merely asserts, without evidentiary support, that

14   "Claimant (and his thousands of colleagues) cannot afford to advance the necessary fees for their

15   cases" despite that "Claimant could, and therefore did, advance sufficient funds to allow the

16   Arbitrator to rule on this one issue."  Mot. 2.  Claimant's take-my-lawyer's-word-for-it strategy is

17   far from adequate under applicable federal and New York law.  *See, e.g.*, *Am. Fam. Life*, 778 F.

18   App'x at 27 ("Because Appellants have not put forth any evidence of their financial inability to

19   pursue arbitration under the terms of this Agreement, their unconscionability claim predicated on

20   the cost-splitting provision must accordingly fail."); *Gordon*, 2023 WL 2138693, at *6 ("Without

21   any showing by Gordon as to the likelihood of him incurring prohibitively expensive costs at

22   arbitration, the Court will not invalidate the Of Counsel Agreement on the basis of prohibitive

23   expense."); *Mariglio*, 133 A.D.3d at 1371 ("Here, plaintiff submitted no evidence concerning the

24   cost of litigating her claims in court, and she thus failed to meet her burden[.]").

25        Claimant does not argue—nor could he—that the Minimum Standards are incorporated

26   into the terms of the DRA.  The DRA never refers to the Minimum Standards, much less states

27   that they govern, even though it expressly states that arbitration will take place under the "then-

28   current JAMS Rules."  DRA § 5.  The JAMS Rules make clear that the Minimum Standards are

1    distinct from the Rules, characterizing the Minimum Standards as one of the "JAMS policies"

2    rather than part of the Rules themselves.  JAMS Employment Rule 2(a).  And again, the

3    Minimum Standards apply only to agreements required as a condition of employment, which the

4    DRA expressly is not.  Moreover, the DRA's specific language embracing fee-apportionment

5    wherever permitted by "applicable law" overrides any general references to fees in JAMS Rules

6    or policies.  *See Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091, 1100 (N.D. Ill. 2015)

7    ("[A]ny default fee provisions in the . . . JAMS rules are overridden by the express Agreement

8    that the parties signed."); *Reed v. Navient Sols., LLC*, No. 17-cv-1218, 2020 WL 13701850, at *4

9    (N.D. Ohio Mar. 24, 2020) ("[T]he JAMS Minimum Standards clearly are not law[.]").

10       Claimant's only attempt to engage with non-California law is to argue that "[g]enerally

11   applicable contract law" requires the Arbitrator to construe the DRA so that it is enforceable and

12   not void.  Mot. 6-8.  This argument is circular because it assumes what it needs to prove—

13   namely, that a fee-splitting agreement would invalidate the DRA or make it unenforceable under

14   federal or New York law.  For the reasons explained already, that is incorrect: neither federal law

15   nor New York law treats such provisions as inherently unlawful.  Sensing this, Claimant shifts

16   gears and claims that "the entire arbitration agreement [is] void" because "JAMS **will not** accept

17   jurisdiction of any arbitration in which an employee subject to a mandatory arbitration agreement

18   is required to share in the arbitration costs."  Mot. 7.  This hindsight-based argument makes little

19   sense as an attempt to discern the contracting parties' intent.  When the parties entered the DRA,

20   they had no reason to anticipate that JAMS would take the position it has taken—particularly

21   when the DRA is not "mandatory" or a condition of employment such that it would trigger JAMS

22   Minimum Standards in the first place.  Besides, JAMS' unsupported determination does not

23   actually make performance of the DRA impossible because courts have the power to appoint

24   substitute arbitrators when a preselected arbitration provider refuses to accept the arbitration.  *See,*

25   *e.g.*, *Khan v. Dell Inc.*, 669 F.3d 350, 354 (3d Cir. 2012).

26       Claimant next contends that the DRA is somehow "illusory" or without consideration, but

27   this argument is also groundless.  Mot. 7-8.  The fact that Twitter now has an ability to accept the

28   Minimum Standards does not make any of the DRA's obligations illusory—just as Claimant's

ability to waive the Minimum Standards does not do so.  If Twitter had a covered dispute with Claimant, it would be bound by the DRA to arbitrate it.

In a last-ditch effort at an argument under non-California law, Claimant invokes the parties' supposed "course of performance."  But Twitter has never accepted the idea that the Minimum Standards apply.  On the contrary, Twitter made its position clear in June 2023, just three and a half weeks after JAMS' notice that it found the Minimum Standards applicable to this case, and just four months after Claimant's Demand. *See* Cohen Decl., ¶ 8.  Claimant's Demand, moreover, asserts that this dispute is not a "consumer arbitration" within JAMS' sense of that term (i.e., "an arbitration conducted under a pre-dispute arbitration provision contained in a contract" drafted by Twitter that "[a]n employee or an applicant for employment" was "required to accept").  Arbitration Demand at 5.  Regardless, because the DRA makes clear that disputes over fee apportionment are reserved for the Arbitrator, any disagreement over the meaning of Section 6 of the DRA could not have become ripe for resolution under the contract's terms until the Arbitrator was asked to weigh in.  The present facts are nothing like those in Claimant's lone New York example, in which the contracting parties had a consistent "course of performance for thirteen years." *In re Barney Mac, LLC*, No. 04-bk-17768, 2006 WL 2864974, at *15 (Bankr. S.D.N.Y. Oct. 3, 2006).

In sum, Claimant has put forward no evidence or plausible argument under the "applicable law" of the FAA and New York that Twitter is "required to pay all of the Arbitrator's and/or arbitration fees."  DRA § 6.  Nor has he put forward any basis for the Arbitrator to allocate fees other than according to the default JAMS Rule that "each Party shall pay its *pro rata* share of JAMS fees and expenses."  JAMS Employment Rule 31(a).  The Arbitrator should adhere to that default rule and construe the DRA as requiring Claimant to bear half of the JAMS fees and expenses for this Arbitration.

### 3.     Even if California Law Applied, it Would Not Support Claimant.

Although Claimant failed to put forward any convincing basis for applying California law to the parties' contract, it is worth emphasizing that the California law he cites would not support the relief he seeks even if it somehow did apply.

Claimant's core argument is that his ability to assert a FEHA claim means that Respondents implicitly agreed "to pay all costs that are unique to arbitration." Mot. 5 (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 689 (Cal. 2000)). Claimant overlooks, however, a critical precondition for this California rule of contract interpretation: it applies only "when an employer imposes mandatory arbitration as a condition of employment." *Armendariz*, 6 P.3d at 687. As detailed above, *see* Section III.A.2, the DRA makes clear that arbitration was not a condition of Claimant's employment. So even on its own terms, Claimant's *Armendariz* argument falls apart. *See Armendariz*, 6 P.3d at 687 (quoting *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1484 (D.C. Cir. 1997)) ("Arbitration will occur in this case only because it has been mandated by the employer as a condition of employment."); *Selman*, 2004 WL 2729656, at *2 ("*Armendariz* only applies to mandatory employment arbitration clauses: those imposed by an employer on a prospective or current employee as a condition of employment.").

In any event, courts have recognized that *Armendariz*'s arbitration-disfavoring rule is preempted by the FAA as recently construed by the U.S. Supreme Court. *See, e.g.*, *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 412 (S.D.N.Y. 2016) ("*Armendariz* is inconsistent with the Supreme Court's 2013 decision in *Italian Colors*, to the extent that the California Supreme Court found arbitration provisions unenforceable merely because the arbitral forum and procedures made it uneconomical to pursue claims in arbitration."); *James v. Conceptus, Inc.*, 851 F. Supp. 2d 1020, 1033 (S.D. Tex. 2012) ("To the extent *Armendariz* precludes arbitration in any employment dispute if the employee is required to bear any type of expense not present in litigation, it appears preempted[.]").

For these reasons, too, Claimant's attempt to rewrite the DRA using *Armendariz* cannot withstand scrutiny.

### C. Twitter Has Not Waived its Objections to the Minimum Standards' Purported Applicability to this Case.

With no valid basis to argue that the DRA requires Twitter to bear the full cost of the Arbitration, Claimant pivots to argue that Respondents have "waived" their right not to bear the full cost "by proceeding under the Minimum Standards." Mot. 10. According to this theory,

"JAMS' case-initiation notice was crystal clear . . . that Respondents would convey their acceptance of those standards by proceeding with the arbitration." *Id.*  Respondents also supposedly "proceeded with the arbitration for months in accordance with the Minimum Standards, paying invoiced fees and participating in arbitration selection," before objecting.  This argument is specious, as Claimant's own evidence shows.

JAMS issued the notice in this case on May 9, 2023.  *See* Dkt., uploaded 5/9/2023.  By its terms, the notice stated that "[t]he parties' **agreement to proceed** constitutes agreement to [the application of the Minimum Standards]." *Id.*  The invoice Claimant cites was issued two weeks later, on May 24, 2023.  Cohen Decl., ¶ 10 & Ex. 9.  Twitter then submitted a global objection to JAMS' position on June 2, 2023—just nine days after the invoice.  *Id.*, ¶ 7 & Ex. 6.  At no point between the May 9 notice and the June 2 letter did Respondents do anything to suggest an "agreement to proceed" with this arbitration under JAMS' view that the Minimum Standards governed.  Claimant cites no communication in which Twitter conveyed such an agreement.  And it is simply false to claim that Twitter "proceeded with the arbitration for months" before objecting to the imposition of the Minimum Standards in this case.  Barely three and a half weeks passed between JAMS' notice and Twitter's written objection.  Claimant cites no decision treating payment of a JAMS invoice as a waiver of an arbitration agreement provision deemed inconsistent with the Minimum Standards.  *See contra Sabre GLBL, Inc. v. Shan*, No. 15-CV-8900, 2018 WL 1905802, at *5 n.8 (D.N.J. Apr. 23, 2018) ("Nor did Shan waive her right to enforce the anti-fee-shifting provision by failing to object when Sabre—pursuant to the Minimum Standards—paid the entire $87,000 arbitration fee."), *reversed in part on other grounds*, 779 F. App'x 843 (3d Cir. 2019).

Contrary to Claimant's suggestion, Mot. 10-11, the Arbitrator's appointment on May 25, 2023 does not constitute waiver, either.  *See* Mot. 4.  After all, JAMS' May 9 notice advised that "[a]ny further issue about whether the Minimum Standards apply should be directed to the arbitrator once he or she is appointed."  *See* Dkt., uploaded 5/9/2023.  According to the notice itself, then, appointment of the Arbitrator was a prerequisite for raising further objection to the Minimum Standards' purported applicability.  In these circumstances, participating in arbitrator

selection could not have been a way of communicating an intention of **abandoning** "[a]ny further issue about whether the Minimum Standards apply."

Finally, any failure to object between the February 13 demand and JAMS' May 25 notice cannot be construed as waiver.  Claimant affirmatively represented on his own JAMS Demand for Arbitration Form that this was **not** a "consumer arbitration," as JAMS defines it.  Arbitration Demand at 5.  Had Claimant been taking the position that he was an employee "required to accept the arbitration provision in the contract"—thereby potentially triggering the Minimum Standards—the correct box to check would have been the box for a consumer arbitration.  *Id.*  On these facts, finding waiver by Twitter would be particularly unjustified.  Indeed, it could be argued that Claimant affirmatively waived the Minimum Standards by electing not to pursue a "consumer arbitration."  Arbitration Demand at 5.

### D.   X Holdings I, Inc. and Elon Musk Have No Conceivable Obligation to Pay the Costs of This Arbitration.

Claimant concedes that Respondents X Holdings I, Inc., and Musk are not parties to the DRA but asserts that they must arbitrate claims against them that are "inextricably intertwined with the claims against Twitter."  Arbitration Demand ¶ 14.  Even so, the Motion offers no rationale for imposing a contractual obligation to pay for this Arbitration on Respondents who did not agree to be bound by the DRA.  The usual rule, for arbitration agreements as for any other contract, is that one is not bound by a contract that one did not agree to.  *See, e.g.*, *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).  At a minimum, the Arbitrator should deny Claimant's requested relief as to those Respondents.[6]

## IV.   CONCLUSION

For all these reasons, the Arbitrator should deny Claimant's Motion in its entirety.

---

[6]   As non-signatories, X Holdings I Inc. and Musk are not proper parties to this arbitration.  In accordance with the Arbitrator's July 19, 2023 order, they reserve, and expressly do not waive, their right to raise that defense or others by joining this submission.

1   Dated: August 31, 2023                MORGAN, LEWIS & BOCKIUS LLP

2

3                                    By   _/s/ Sari M. Alamuddin_
                                          Eric Meckley
4                                         Brian D. Berry
                                          Sari M. Alamuddin
5                                         Kaiser Chowdhry
                                          Ashlee N. Cherry
6                                         Kassia Stephenson

7                                         Attorneys for Respondents

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE TO MOTION FOR INTERIM AWARD