# EXHIBIT 3

CAUSE NO. 1601002342

| | |
|---|---|
| YUNFENG ZHANG,<br><br>CLAIMANT,<br><br>V.<br><br>TWITTER, INC., X HOLDINGS I, INC., AND ELON MUSK,<br><br>RESPONDENTS. | JAMS |

**CLAIMANT YUNFENG ZHANG'S REPLY IN FURTHER SUPPORT OF CLAIMANT'S MOTION FOR AN INTERIM AWARD**

KAMERMAN, UNCYK, SONIKER &
   KLEIN P.C.
Akiva M. Cohen, Esq.
Attorneys for Plaintiffs
1700 Broadway, 16th Floor
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................iii
ARGUMENT......................................................................................................................................1
    I.   JAMS Correctly Interpreted Its Own Rules and the DRA Does Not Provide the Arbitrator with Authority to Overrule That Interpretation ................................................................1
    II.  The DRA Contains No Choice of Law Clause and California Law Applies................................2
    III. The DRA Requires Respondents to Bear the Forum Costs ............................................................5
    IV. Respondents Continue to Mischaracterize the DRA as Requiring Equal Fee Splitting Unless Prohibited by Law ..................................................................................................................8
    V.  Finally, Respondents Waived Any Objection to Proceeding Under the Minimum Standards...9
CONCLUSION................................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83 (2000) ...................................... 4

*Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091 (N.D. Ill. 2015) .................................................. 8

*Cordero v. C.R. England, Inc.*, 2021 WL 2793929 (C.D. Cal. Apr. 30, 2021) ................................... 2

*Essex v. Children's Place, Inc.*, No. CV 15-5621, 2017 WL 6000347 (D.N.J. Dec. 4, 2017) ........... 2

*Gentry v. Superior Ct.*, 42 Cal. 4th 443 (2007) ................................................................................ 3

*Gould v. Lightstone Value Plus Real Est. Inv. Tr., Inc.*, 301 F. App'x 97 (2d Cir. 2008) ................ 6

*Guan v. Uber Techs., In*c., 236 F. Supp. 3d 711 (E.D.N.Y. 2017) .................................................... 3

*Heisman v. Wyndham Vacation Resorts, Inc.*, No. CV2011480KMJBC, 2021 WL 1138125 (D.N.J. Mar. 22, 2021) .................................................................................................................. 5

*James v. Conceptus, Inc.*, 851 F. Supp. 2d 1020 (S.D. Tex. 2012). ................................................... 4

*Loc. 355 United Serv. Workers Union, Int'l Union of Journeymen & Allied Trades v. Dual-Purpose Corp.*, No. 17-CV-262 (CBA) (ST), 2018 WL 3151686 (E.D.N.Y. Mar. 1, 2018) .................................. 5

*Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016) ........................................................ 2

*Moss v. First Premier Bank*, 835 F.3d 260 (2d Cir. 2016) ............................................................... 5

*Natixis Funding Corp. v. GenOn Mid-Atl.*, LLC, 181 A.D.3d 481 (2020) ....................................... 7

*OTO, L.L.C. v. Kho*, 8 Cal. 5th 111 (2019) ....................................................................................... 3

*Ranzy v. Extra Cash of Texas, Inc.*, No. CIV.A. H-09-3334, 2010 WL 936471 (S.D. Tex. Mar. 11, 2010), *aff'd sub nom. Ranzy v. Tijerina*, 393 F. App'x 174 (5th Cir. 2010) ............. 5

*Reed v. Navient Sols., LLC*, No. 1:17-CV-1218, 2020 WL 13701850 (N.D. Ohio Mar. 24, 2020) .......... 8

*Rodriguez v. Four Seasons Hotels, Ltd.*, No. 09 CIV. 2864 (DLC), 2009 WL 2001328 (S.D.N.Y. July 10, 2009) .................................................................................................................. 2

*Simeon v. Domino's Pizza LLC*, No. 17CV5550RJDST, 2019 WL 7882143 (E.D.N.Y. Feb. 6, 2019) .................................................................................................................. 2

*Sims v. Worldpac Inc.*, No. C 12-05275 JSW, 2013 WL 663277 (N.D. Cal. Feb. 22, 2013) ............ 4

*Young v. Refined Techs., Inc.*, No. SACV2201032CJCJDEX, 2022 WL 3012536 (C.D. Cal. June 17, 2022) .................................................................................................................. 2

**Other Authorities**

JAMS Arbitration Schedule of Fees and Costs ................................................................................ 9

JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ................ 2

**Rules**

JAMS Employment Arbitration Rules & Procedures Rule 2 ........................................................... 6

JAMS Employment Arbitration Rules & Procedures Rule 31(c) ............................................... 2, 6

In his moving brief ("MB") in support of his motion for an interim award (the "Motion"), Claimant demonstrated that, properly construed, the DRA[1] requires Respondents to pay the arbitral fees in this dispute. As shown below, Respondents'[2] opposition ("Opp") makes a series of meritless contrary arguments, and the Motion should be granted.

## ARGUMENT

### I. JAMS Correctly Interpreted Its Own Rules and the DRA Does Not Provide the Arbitrator with Authority to Overrule That Interpretation

Respondents open their argument by again insisting that the Arbitrator should not construe the DRA at all because the Arbitrator cannot compel Claimant to waive the Minimum Standards. Opp at 8. They do so despite simultaneously arguing the exact opposite position to the Delaware District Court: that *only* an Arbitrator can construe the DRA and determine if Respondents' conduct breached it. Cohen Reply Dec. Ex. 1 at 18-19. Respondents cite no law for the proposition that Claimant cannot seek a declaratory judgment about the meaning of the DRA unless the outcome of that declaratory judgment could potentially leave "Respondents [] better off than before."[3] Opp at 8. There is no such rule, and because Claimant could have obtained such a declaration from a Court absent the arbitration agreement, the DRA entitles him to obtain one from the Arbitrator. *See* MB at 12.

Respondents' argument that the Arbitrator ought to be empowered to interpret JAMS' Rules in a manner that is binding on JAMS is similarly frivolous. Arbitration is a creature of contract, and the parties' DRA does not allocate to the Arbitrator a dispute about the meaning of JAMS' Rules. Cohen Dec. Ex. 5 at 1 (covered disputes are only those arising from or relating to the interpretation of the DRA or disputes regarding the employment relationship). In any event, *JAMS* is not a party

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

[2] Respondents argue that X Holdings and Musk are not bound by Twitter's arbitration agreement. As to Musk, that dispute will be the subject of a different motion. But as to X Holdings, it is a profoundly disingenuous argument, because X Holdings is *simultaneously* taking *the exact opposite* position in its motion to compel arbitration in *Woodfield v. X. Holdings Corp. et al.*, C.A. No. 1:23-cv-780-CFC (D. Del.), a motion it filed *just three days* prior to filing this brief. *See* Cohen Reply Dec. Ex. 1.

[3] Respondents' argument here reveals their recognition that – contrary to their claims, Opp at 7 – no Court could appoint a substitute arbitrator on the circumstances here. *See infra* at III. Were that possible, a declaration that the DRA requires Mr. Zhang to pay 50% of the fees would leave Respondents better off by allowing them to seek appointment of a substitute arbitrator after Respondents rendered JAMS "unavailable" by refusing to abide by its Rules.

1

to the DRA and therefore could not be bound by any such purported delegation; JAMS has authority to interpret its own rules.

And JAMS' interpretation of those Rules was correct. The Rule is clear: "If an Arbitration is *based on a clause or agreement* that is required as a condition of employment" the employee cannot be required to share the forum fees beyond a portion of the initial filing fee. JAMS Rule 31(c); Minimum Standards, Standard 6. This arbitration is based on the DRA. The DRA is an agreement "required as a condition of employment"; Mr. Zhang literally could not accept employment at Twitter without executing the DRA. Cohen Dec Ex. 2 at 8; Cohen Reply Dec Ex. 2 at 3. This remains true whether or not the DRA is a contract of adhesion, and whether or not Mr. Zhang had the ability to later opt out of the DRA after first executing the document as required by his offer letter.[4] Under JAMS' Rules, that is sufficient to require application of the Minimum Standards.

## II. The DRA Contains No Choice of Law Clause and California Law Applies

At the preliminary conference, Respondents suggested the DRA had a choice of law clause because it set New York as the place of hearing. Now, Respondents shift their attention to a different provision: that a party seeking to *enforce* the DRA may do so under the FAA or, if the FAA is found not to apply, under the law of the employee's home state. Not only does that provision focus exclusively on the procedures for *enforcement* of the agreement, rather than interpretation of disputed provisions (indeed, the FAA provides no rules of construction in the first instance), but there has never been a finding that the FAA does not apply to the DRA (nor could there be). Thus,

---

[4] In that regard, the cases cited by Respondents are instructive. In *Young v. Refined Techs., Inc.*, No. SACV2201032CJCJDEX, 2022 WL 3012536, at *5 (C.D. Cal. June 17, 2022), the Court cited *Cordero v. C.R. England, Inc.*, 2021 WL 2793929 (C.D. Cal. Apr. 30, 2021) for the proposition that "an opt-out provision" would be an "indicia" that an agreement was not required as a condition of employment. But the "opt-out provision" in *Cordero* allowed the employee to refuse to sign the arbitration agreement in the first instance. *Cordero*, 2021 WL 2793929, at *2. Similarly, the "opt-out provision" in *Essex v. Children's Place, Inc.*, No. CV 15-5621, 2017 WL 6000347 (D.N.J. Dec. 4, 2017) provided the employee with the opportunity to decline to sign the arbitration agreement. *Id.* at *3. The Plaintiff in *Rodriguez v. Four Seasons Hotels, Ltd.*, No. 09 CIV. 2864 (DLC), 2009 WL 2001328 (S.D.N.Y. July 10, 2009) was similarly not required to sign the arbitration agreement prior to opting out. *Id.*, *4. Finally, the Courts in *Simeon v. Domino's Pizza LLC*, No. 17CV5550RJDST, 2019 WL 7882143 (E.D.N.Y. Feb. 6, 2019) and *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016) were addressing arguments that arbitration agreements that allowed an employee to subsequently opt out were unenforceable as *unconscionable*. *See Simeon*, 2019 WL 7882143, *5; *Mohamed*, 848 F.3d at 1211. But JAMS' rule applies more broadly than to unconscionable agreements – by its terms, it applies to any arbitration based on an agreement the employee was compelled to sign as a condition of employment, even if the arbitration agreement itself is enforceable. JAMS' refusal to indulge the "opt-out" trick as a workaround was entirely correct.

2

this provision cannot be read as selecting New York law for disputes over interpretation of the DRA,[5] and the Arbitrator must apply New York's choice-of-law rules.[6]

And Respondents entirely ignore Claimant's point on that analysis: given California's fundamental public policy interest in controlling the terms of arbitration agreements that could conceivably impact FEHA, and the absence of any countervailing public policy interest of New York, that analysis requires application of California law. Respondents do not deny that California's public policy interest here is strong, and make no argument that New York has any public policy interest at all. The closest Respondents come to addressing the public policy balance is in a parenthetical describing *Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711 (E.D.N.Y. 2017) as holding that *in that case*, New York's policy interests mandated application of New York law. Opp at 12. But that makes Claimant's point for him. There, the question was the enforceability of click-wrap contracts relating to New York employment, an issue for which New York's policy interests were readily apparent. *Id.* at 722. Here, Respondents identify no similar policy concerns at issue for New York; California is the only state with a strong public policy interest in *this* issue. Thus, under New York choice of law rules, California law applies.

And under California law, Respondents must pay the arbitration costs. Respondents argue that *Armendariz* is inapplicable because the DRA included an opt-out provision. But the California Supreme Court *specifically* rejected the argument that a *subsequent* opt-out provision can remove an arbitration agreement from *Armendariz*'s ambit where *Armendariz* is protecting against waiver of non-waivable statutory rights (as opposed to mere unconscionability). *See Gentry v. Superior Ct.*, 42 Cal. 4th 443, 467 (2007) (opt out provision has no impact on validity of class-action waiver under *Armendariz* because opt-out cannot rescue pre-dispute waiver of non-waivable statutory rights, and impacts only issues of unconscionability).[7] *Cf. Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.

---

[5] As noted in the Moving Brief, to the extent that any disputed provision in the DRA is ambiguous, the Arbitrator must construe it in Claimant's favor. MB at 10 (and at 6 n.5). Respondents do not contest that proposition.

[6] Respondents only argue under the "center-of-gravity" test applicable to contractual choice of law. But as Claimant noted in his opening brief, that is not the test applicable to choice-of-law issues relating to tort claims, and Claimant's FEHA claim is a tort claim, not a contractual claim.

[7] "*Gentry's* holding [that] class arbitration waivers [are unenforceable] ha[s] been abrogated by United States Supreme Court precedent." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 129 (2019)

3

4th 83, 102 (2000) (fees provision is matter of non-waivable statutory rights). Thus, Respondents' argument that the opt-out provision alters the requirements of California law is meritless.[8]

Similarly, Respondents' argument that Claimant did not adequately plead his FEHA claim is misplaced, incorrect, and irrelevant. It is misplaced because this motion is not the proper place for the argument; the claim remains live unless and until a motion to dismiss the claim is granted. The argument is also incorrect. Claimant's FEHA claim was sufficiently pled under Rule 9, and met the standards articulated in *Sims v. Worldpac Inc.*, No. C 12-05275 JSW, 2013 WL 663277 (N.D. Cal. Feb. 22, 2013), which distinguished *Campbell* and *Gonsalves* on the basis that "in those cases, the courts found that there were insufficient facts to conclude that the decisions had been made in California." *Id.*, *3. And, in any event, Respondents' objection is irrelevant; California's requirement that the employer agree in the arbitration agreement to bear the unique costs of arbitration – and its insertion of such a provision into each DRA as a matter of law – does not turn on whether the employee *eventually and in fact asserts a viable FEHA claim*, but on whether such a claim, if viable, *would be covered under the arbitration agreement*. *Armendariz*, 24 Cal. 4th at 113. Because Respondents do not dispute that their DRA covers any FEHA claims Mr. Zhang could conceivably have if Respondents violated FEHA, they do not contest that California law requires the DRA to be construed as mandating that Respondents bear the forum fees.

Finally, Respondents' preemption argument is frivolous; no court has held that a state law requirement that employers pay the costs of arbitration is preempted by the FAA, and Respondents make no argument that doing so *precludes* arbitration. *Armendariz* may be preempted to the extent that it held that certain arbitration agreements were *per se* unconscionable and invalid. *See James v. Conceptus, Inc.*, 851 F. Supp. 2d 1020, 1033 (S.D. Tex. 2012). But as no party to this proceeding has argued *Armendariz* renders the DRA invalid, that argument carries no weight.

---

[8] The *Gentry* rule that a right to later opt out of a mandatory arbitration agreement does not make the agreement less than mandatory for purposes of *Armendariz* makes logical sense, as well. Much like the JAMS rules and the Minimum Standards, *Armendariz* implies into the agreement, as a matter of law and *at the moment the contract was entered as a mandatory condition of employment*, the company's agreement to pay fees. The subsequent opt out right, then, would be for the employee to opt out of an arbitration agreement that already includes the fees agreement implied by law.

### III.     The DRA Requires Respondents to Bear the Forum Costs

Regardless, generally applicable rules of contract construction require Respondents to pay the forum fees. Not only would Respondents' proposed construction render the DRA illegal under California law, as discussed above, but as Claimant noted in the Moving Brief, it would also render performance impossible and the entire agreement unenforceable, and therefore must be rejected. Respondents' sole response on this point is to suggest that the parties could petition the Court for appointment of a new arbitrator pursuant to §5 of the FAA. But that is triply wrong. It is wrong because §5 of the FAA is entirely inapplicable here; that provision applies when an arbitrator is not named, *not* when the named arbitrator declines to continue to administer an arbitration because one party will not abide by its rules. *See Moss v. First Premier Bank*, 835 F.3d 260, 266 (2d Cir. 2016) ("the "lapse" referred to in Section 5 means a lapse in time in the naming of the arbitrator or in the filling of a vacancy on a panel of arbitrators or some other mechanical breakdown in the arbitrator selection process") (quotation omitted); *Loc. 355 United Serv. Workers Union, Int'l Union of Journeymen & Allied Trades v. Dual-Purpose Corp.*, No. 17-CV-262 (CBA) (ST), 2018 WL 3151686, at *8 (E.D.N.Y. Mar. 1, 2018) (substitute cannot be appointed where agreement selects exclusive arbitration provider, has no provision for appointing a substitute, and no indication the parties agreed to arbitrate before anyone else). Even under the Third Circuit approach cited by Respondents (which has no application to Claimant), Respondents' unwillingness to follow JAMS' rules does not make JAMS "unavailable." *See Heisman v. Wyndham Vacation Resorts, Inc.*, No. CV2011480KMJBC, 2021 WL 1138125, at *4 (D.N.J. Mar. 22, 2021) (Section 5 substitution not available despite AAA refusing to administer arbitration because "[h]ere, the AAA is able and willing to hold arbitrations with Wyndham if Wyndham complies with its rules"). *See also Bedgood v. Wyndham Vacation Resorts, Inc.*, 595 F. Supp. 3d 1195, 1203–04 (M.D. Fla. 2022) (same). It is also wrong because the parties designated JAMS as the exclusive arbitration venue and pervasively cited the JAMS Rules, and §5 substitution cannot be invoked where the choice of arbitrator was central to the arbitration agreement. *Ranzy v. Extra Cash of Texas, Inc.*, No. CIV.A. H-09-3334, 2010 WL 936471, at *5 (S.D. Tex. Mar. 11, 2010), *aff'd sub nom. Ranzy v. Tijerina*, 393 F. App'x 174 (5th Cir. 2010). And finally it is

wrong *because substitution would not matter*. Any new arbitrator would still need to conduct the arbitration pursuant to JAMS' Rules, Cohen Dec Ex. 5 at 5, and JAMS' Rules both prohibit the parties from deviating from the Minimum Standards, JAMS Rules, Rule 2, and prohibit fee-splitting where the Minimum Standards would apply. *Id.*, Rule 31(c). So even with substitution, no arbitrator could administer the arbitration under Respondents' construction of the DRA.

Similarly, construing the DRA as Respondents wish would render the arbitration agreement illusory, with Respondents having the opportunity to opt out of arbitration at any time by refusing to abide by the Minimum Standards. Respondents simply hand-wave here, offering no substantive argument that they could be compelled to arbitrate with JAMS and instead pointing to Claimant's theoretical ability to waive the Minimum Standards as a corresponding power.[9] Opp at 16-17. But that would only make things worse: on Twitter's proposed construction, the parties' DRA was merely an agreement to consider potentially arbitrating on a case-by-case basis, depending on their desire to either waive or comply with the Minimum Standards. That is the very definition of an illusory contract. *See Gould v. Lightstone Value Plus Real Est. Inv. Tr., Inc.*, 301 F. App'x 97, 100 (2d Cir. 2008) (if provision was just an agreement to agree, that "would make the provision unenforceable as an illusory promise").

Moreover, the DRA provides that the arbitration will be conducted by the JAMS Rules, and the JAMS Rules plainly incorporate the fees provisions of the Minimum Standards, both in Rule 2 (generally noting that the parties may not deviate from the Minimum Standards) and in Rule 31(c). Other than Respondents' assertion that the Arbitrator ought to be empowered to overrule JAMS' determination that the Minimum Standards apply, Respondents have no response to this point.

Respondents also ignore their repeated course of performance under the DRA. In thousands of arbitrations filed since December 2022, Respondents received JAMS invoices for case initiation fees only due under the Minimum Standards and Rule 31(c). For six months, through June 2023, Respondents paid those invoices without suggesting they were not required to under the DRA, at a

---

[9] As a practical matter, it would be pyrrhic for Claimant to pay potentially five-to-six figures in fees on his severance and other claims. But Claimant has not argued that should impact the appropriate construction of the DRA, much though Respondents would like to pretend otherwise. Opp at 15.

6

cost in the seven figures. While Respondents now suggest those months are insufficient to establish a course of performance confirming they understood the DRA as obligating them to pay fees, millions of dollars in fee payments is more than sufficient to establish that Respondents must have understood that those fees were, in fact, due. Indeed, during that period Respondents had no difficulty refusing to pay case initiation fees they did not believe were due, and asking JAMS to reissue invoices on that basis. *See, e.g.*, Cohen Reply Dec. Exs. 3-4. The conclusion is unmistakable: Respondents paid the fees because they knew the DRA required it.

Finally, as noted above, Respondents do not deny that to the extent the fees provision is ambiguous, it must be construed as obligating Respondents to pay those fees. Indeed, Respondents point to no principle of contract interpretation which would suggest that Twitter did *not* agree to abide by the Minimum Standards when it amended its form DRA to provide for arbitration by JAMS, a provider that expressly refuses to accept arbitrations that do not comply with those Minimum Standards. Instead, Respondents refer to that as a "hindsight-based argument" and assert that "[w]hen the parties entered the DRA, they had no reason to anticipate that JAMS would" apply the Minimum Standards. Opp at 16. But Respondents notably decline to submit any testimony to that effect from Twitter, and certainly cannot speak to what their employees did or did not anticipate when they signed the agreement Twitter drafted. Twitter is, at best, arguing that it made a unilateral mistake when it drafted the agreement. And, particularly given that Twitter was the drafting party, Twitter bears the consequences of their own errors. *See Natixis Funding Corp. v. GenOn Mid-Atl.*, LLC, 181 A.D.3d 481, 483 (2020).

Ultimately, what Twitter "anticipated" is irrelevant; the question is simple: when Twitter chose JAMS as its provider and agreed that the arbitration would be held according to the JAMS Rules, did it agree to abide by those rules however JAMS interpreted them if and when an arbitration occurred? The answer is, self-evidently, yes; the DRA contains no carve-outs limiting JAMS' authority to construe its own rules or limiting the parties' requirement to be bound by those determinations. The Arbitrator should thus construe the DRA as including Respondents' agreement to abide by the rules of Twitter's chosen arbitration provider, and pay the forum fees.

### IV. Respondents Continue to Mischaracterize the DRA as Requiring Equal Fee Splitting Unless Prohibited by Law

Even if the DRA is not construed as requiring Respondents to pay 100% of the forum fees, *nothing* in the DRA requires Claimant to pay anything at all. Respondents engage in a long discussion of whether New York or law federal law require Respondents to pay the arbitration fees, on the assumption that if not, the DRA must require Claimant to pay 50% of the forum costs. Opp at 14-17. *But that is not what the DRA provides.*

The DRA Respondents drafted provides that for attorneys' fees, each party will bear their own *attorneys' fees*. Cohen Dec. Ex. 5 at 6. As to forum costs, however the DRA provides two options: (1) if required by law, Twitter "will pay the Arbitrator's and arbitration fees"; and (2) if that is not required by law, such fees "will be apportioned between the parties in accordance with said applicable law" and disputes about such apportionment will be "resolved by the Arbitrator." *Id.* That provision notably does not require such costs to be apportioned equally between the parties, and Respondents cite no provision of Federal or New York law requiring equal apportionment by default.[10] To the contrary, as Claimant noted in the Moving Brief, the default provision of New York law is that the apportionment of fees is at the Arbitrator's discretion. MB at 17. And the Arbitrator's discretion here is cabined by JAMS' Rules and the Minimum Standards, which require the Arbitrator to allocate all such fees to Respondents. *Id.* Such an allocation would be "in accordance with [New York] law." Respondents simply ignore this issue in the Opp, never mentioning or addressing it.

Indeed, for the same reason, Respondents' suggestion that application of the Minimum Standards can be overridden by the DRA is not viable. The clause at issue here stands in stark contrast to the clause at issue in *Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091 (N.D. Ill. 2015), in which the parties had agreed to "each pay an equal share of the costs and expenses of such arbitration, except as prohibited by law." *Id.* at 1100. And in *Reed v. Navient Sols., LLC*, No. 1:17-CV-

---

[10] Respondents instead cite to the default *JAMS* Rule that fees are shared equally unless otherwise agreed or Rule 31(c) and the Minimum Standards apply. Opp at 17. But Respondents again make Claimant's point for him: Respondents cannot seriously argue that JAMS' application of its Rules to require Respondents to pay the arbitration fees is contrary to the DRA because Rule 31(a) – which JAMS found inapplicable – provides a different default.

1218, 2020 WL 13701850 (N.D. Ohio Mar. 24, 2020), the parties' agreement *did not* incorporate the JAMS Rules, and that was the *express* basis on which the court held that the agreement could theoretically trump the Minimum Standards.[11]  *Id.*, *4, n.2.

### V. Finally, Respondents Waived Any Objection to Proceeding Under the Minimum Standards

Last, even were none of that true, Respondents' objections are waived. Respondents pretend that their relevant behavior runs from JAMS' notice to them that *this specific arbitration* would proceed under the Minimum Standards, on May 9, 2023. But that is not the relevant period.

JAMS issued its first invoice to Respondents in this proceeding, for "case initiation fees," on March 6, 2023. Cohen Reply Dec. Ex. 5. Under the Rules and JAMS' fee schedules, Respondents could only be responsible for case initiation fees under the Minimum Standards; otherwise, such fees are entirely the Claimant's responsibility. *See Arbitration Schedule of Fees and Costs*.[12] And Respondents were already well aware that JAMS was issuing that invoice to them because it was applying the Minimum Standards to the ex-employees' arbitration demands; they had received such notice in multiple other cases – including, for another of undersigned counsel's clients using the same general form of demand, a month earlier on February 10, 2023. Cohen Dec. Ex. 8. Thus, Respondents were already on notice, from early February and March 2023, both that the Minimum Standards would apply and also that they would "apply notwithstanding any contrary provisions in the parties' predispute arbitration agreement." *Id.* Respondents had likewise *already* been informed that their "agreement to proceed constitutes agreement" that the Minimum Standards would apply in these arbitrations. *Id.*  Despite that, Respondents paid the case initiation fees in this matter without complaint or cavil about the Minimum Standards. And Respondents proceeded to engage in arbitrator selection without raising any dispute that the Minimum Standards applied and that they were responsible for paying forum fees as provided in the Minimum Standards. In so doing, Respondents waived any objection they might otherwise have had.

---

[11] The court in *Reed* construed the contract as requiring Navient to pay the appeal fees, but noted that the plaintiffs had not sought relief for Navient's breach of contract in not doing so. *Id.*, *3-4.
[12] https://www.jamsadr.com/arbitration-fees

Respondents' only argument on this point, aside from the misdirection about relevant dates, is that the notice that the Minimum Standards applied directed them to make further arguments to the arbitrator once appointed, and therefore they did not waive any objection by following that instruction. Opp at 19-20.[13] But when Respondents finally objected to the Minimum Standards, *that is not what they did*; rather, they filed objection letters and made arguments *to JAMS itself*. Cohen Dec. Exs. 6, 11. Thus, the argument that Respondents were simply choosing to wait to present their objections to individual arbitrators is empirically false, and Respondents could have taken the action they eventually did - appealing to JAMS as an organization and then declaring that they would not proceed under the Minimum Standards - in February, March, April, or May. Indeed, Respondents *currently* object to the Arbitrator even considering this issue, and have not filed objections with any other arbitrator. To the contrary, Respondents have refused to pay arbitral appointment fees that would allow other arbitrators to even consider such an objection. More, if Respondents *had* wished to raise the issue with the arbitrators, they could have informed JAMS (and Claimant and his colleagues) as much promptly on receipt of the notice. Instead, they continued to arbitrate under the Minimum Standards for months without raising any dispute at all, despite being specifically informed that such behavior would constitute consent to the Minimum Standards. On that record, Respondents waived any challenge they might otherwise have had.

## CONCLUSION

Respondents' problem is of their own making; they drafted an arbitration agreement with provisions they now regret. That change of heart is no basis to deny the Motion, and the Arbitrator should grant the requested Interim Award.

Dated: September 12, 2023

---

[13] Respondents also suggest that a clerical error in misunderstanding JAMS' "consumer arbitration" checkbox should impact the Arbitrator's analysis. *See* Declaration of Kathryn Tewson. Not only is that argument unseemly, Respondents notably fail to submit a declaration suggesting that they in fact believed that this arbitration – unlike the others following the same template – would not be subject to the Minimum Standards. Indeed, Respondents do not even make that claim in unsworn attorney argument, merely gesturing at it in apparent hopes that the Arbitrator will mistakenly infer it. *See* Opp at 20 (studiously avoiding any claim that the checkbox impacted Respondents' subjective beliefs about Claimant's allegations or how JAMS would respond). At a *minimum*, the argument should be disregarded.

    */s/ Akiva M. Cohen*
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER & KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

11