# EXHIBIT 10



# Demand for Arbitration Form

Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

📞 **1-800-352-JAMS**
✦ **www.jamsadr.com**

---

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service** of the Demand on the appropriate party *(2 copies)*

**C. Entire contract containing** the arbitration clause *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,750. For matters involving three or more parties, the filing fee is $3,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 13% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,750 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.* **JAMS may apply its Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.**

- *A refund of $875 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | |
|---|---|
| **RESPONDENT NAME** | Twitter, Inc. |
| **ADDRESS** | 1355 Market St #900 |

| | | | | | |
|---|---|---|---|---|---|
| **CITY** | San Francisco | **STATE** | CA | **ZIP** | 94103 |

| | | | | |
|---|---|---|---|---|
| **PHONE** | (415) 222-9670 | **FAX** | **EMAIL** | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Brian D. Berry |
| **FIRM/COMPANY** | Morgan, Lewis & Bockius LLP |
| **ADDRESS** | One Market, Spear Street Tower |

| | | | | | |
|---|---|---|---|---|---|
| **CITY** | San Francisco | **STATE** | CA | **ZIP** | 94105 |

| | | | | | |
|---|---|---|---|---|---|
| **PHONE** | (415) 442-1000 | **FAX** | (415) 442-1001 | **EMAIL** | brian.berry@morganlewis.com |

## FROM CLAIMANT

Add more claimants on **page 7**.

| | |
|---|---|
| **CLAIMANT NAME** | Nicholas Tapalasky |
| **ADDRESS** | ▉▉▉▉▉▉▉ |

| | | | | | |
|---|---|---|---|---|---|
| **CITY** | ▉▉▉▉▉▉▉ | **STATE** | NY | **ZIP** | ▉▉▉▉ |

| | | | | |
|---|---|---|---|---|
| **PHONE** | | **FAX** | **EMAIL** | |

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Akiva M. Cohen |
| **FIRM/COMPANY** | Kamerman, Uncyk, Soniker & Klein, P.C. |
| **ADDRESS** | 1700 Broadway, 16th Floor |

| | | | | | |
|---|---|---|---|---|---|
| **CITY** | New York | **STATE** | NY | **ZIP** | 10019 |

| | | | | | |
|---|---|---|---|---|---|
| **PHONE** | (212) 400-4930 | **FAX** | (866) 221-6122 | **EMAIL** | acohen@kusklaw.com |

# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐ If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Attached Demand for Arbitration

AMOUNT IN CONTROVERSY (US DOLLARS) _____

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach* <u>two copies</u> *of entire agreement.*

ARBITRATION PROVISION LOCATION

Tapalansky Nick - DRA.pdf (attached)

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with* <u>two copies</u> *to JAMS.*

## REQUEST FOR HEARING

REQUESTED LOCATION

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

*See: Comprehensive Rule 16.1*

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | /s/ Akiva M. Cohen | DATE | May 5, 2023 |
|---|---|---|---|

| NAME (PRINT/TYPED) | Akiva M. Cohen |
|---|---|



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

**Completion of this section is <u>required for all consumer or employment claims</u>.**

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e),* as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☑ **<u>YES</u>**, this **is** a CONSUMER ARBITRATION.

☐ **<u>NO</u>**, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS
**If this is an EMPLOYMENT matter, Claimant must complete the following information:**

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000     ☐ $100,000 to $250,000     ☐ More than $250,000     ☑ Decline to State

## WAIVER OF ARBITRATION FEES
**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Corp. |
|---|---|

| ADDRESS | 701 S CARSON ST STE 200, |
|---|---|

| CITY | Carson City | STATE | NV | ZIP | 89701 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
|---|---|

| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
|---|---|

| ADDRESS | One Market, Spear Street Tower |
|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holdings I, Inc. |
|---|---|

| ADDRESS | 1209 ORANGE ST |
|---|---|

| CITY | Wilmington | STATE | DE | ZIP | 19801 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry |
|---|---|

| FIRM/COMPANY | Morgan, Lewis & Bockius LLP |
|---|---|

| ADDRESS | One Market, Spear Street Tower |
|---|---|

| CITY | San Francisco | STATE | CA | ZIP | 94105 |
|---|---|---|---|---|---|

| PHONE | (415) 442-1000 | FAX | (415) 442-1001 | EMAIL | brian.berry@morganlewis.com |
|---|---|---|---|---|---|

# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #4 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | X Holding Corp. | | |
|---|---|---|---|
| ADDRESS | One Market, Spear Street Tower | | |
| CITY | San Francisco | STATE CA | ZIP 94105 |
| PHONE (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | |
|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | |
| ADDRESS | 1355 Market St #900 | | |
| CITY | San Francisco | STATE CA | ZIP 94103 |
| PHONE | FAX | EMAIL | |

## RESPONDENT #5 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | Elon Musk | | |
|---|---|---|---|
| ADDRESS | One Market, Spear Street Tower | | |
| CITY | San Francisco | STATE CA | ZIP 94105 |
| PHONE (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | Brian D. Berry | | |
|---|---|---|---|
| FIRM/COMPANY | Morgan, Lewis & Bockius LLP | | |
| ADDRESS | One Market, Spear Street Tower | | |
| CITY | San Francisco | STATE CA | ZIP 94105 |
| PHONE (415) 442-1000 | FAX (415) 442-1001 | EMAIL brian.berry@morganlewis.com | |

CAUSE NO. _____

| | |
|---|---|
| NICK TAPALANSKY, | |
| **CLAIMANT,** | |
| **V.** | |
| **TWITTER, INC., X CORP., X HOLDINGS I, INC., X HOLDING CORP., AND ELON MUSK,** | **JAMS** |
| **RESPONDENTS.** | |

## CLAIMANT'S DEMAND FOR ARBITRATION

Claimant Nick Tapalansky ("Nick") files this Original Demand for Arbitration ("Demand") against Respondents Twitter, Inc. ("Twitter"), X Corp., X Holdings I, Inc. ("X Holdings I"), X Holding Corp.,[1] and Elon Musk ("Musk") (collectively, "Respondents"), and would respectfully show as follows:

### I.   INTRODUCTION

1.   This Arbitration arises out of Twitter's attempt to avoid paying its ex-employees the severance it promised them.

2.   Twitter made these promises many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that

---

[1] As discussed below, Twitter appears to have merged into X Corp., with X Corp. as the surviving corporation, and X Holdings I appears to have merged into X Holding Corp., with X Holding Corp. as the surviving corporation. Twitter, Inc. and X Holdings I are included as respondents here in an abundance of caution, and references to "Twitter" and "X Holdings I" include the merged successor corporation where appropriate or required.

they would receive severance at least as favorable during the post-merger period as they had under

the old management. And Twitter went out of its way to make additional promises and

representations to its employees to allay their concerns in advance of its purchase by Musk and

convince them to stay employed at Twitter pending the close of that transaction.

3.   Twitter broke all these promises, breaching their enforceable agreements with its former

employees in the process.

4.   The saga surrounding this breach of faith began in late March 2022, when Musk issued

vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed

that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's

Board of Directors, he announced his intention to purchase Twitter and take it private.

5.   On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some

back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to

approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II,

Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25,

2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly

owned subsidiary of X Holdings I (the "Merger Agreement").

6.   As relevant here, the Merger Agreement included the parties' agreement, in Section

6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause

Twitter to provide any remaining Tweeps with "severance payments and benefits … no less

favorable than" those provided under Twitter's policies – written or unwritten – immediately prior

to the merger.

7.   Twitter communicated that commitment to its employees almost immediately. By April

26, 2022 – the day after the Merger Agreement was announced – it had already published an

"Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement

specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

8.   That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited: "Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was ***not*** what would happen to them if Twitter carried out a layoff after the merger closed.

9.   Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

10.  Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape

his agreement to purchase Twitter – and, on information and belief, were made in order to assuage

that concern and convince Twitter employees to stay at Twitter through the merger.

11. As detailed below, that worked; Nick relied on Twitter's representation that he would

have a safety net if he was terminated after the merger as part of his decision to remain at Twitter.

12. On January 4, 2023, after the close of the merger, Nick was laid off by Twitter. Yet

Twitter has refused to provide him with the severance it promised.

## II.  ARBITRATION PROVISION

**13.  This dispute is governed by Twitter's Dispute Resolution Agreement ("DRA"),**

**which Nick signed. A copy of Nick's executed DRA is submitted herewith, and provides for**

**arbitration with JAMS.**

**14.  There is no arbitration agreement between Nick and either Musk or X Holdings**

**I. Despite that, Musk and X Holdings I must arbitrate the claims against them because**

**those claims are inextricably intertwined with the claims against Twitter and arise out of**

**Nick's employment with Twitter.**

## III.          PARTIES

15. Claimant Nick Tapalansky is a former Twitter employee ▮▮▮▮▮▮▮▮ New

York. While employed at Twitter, Nick worked from his home, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ New York, and was assigned to Twitter's office located in Albany, New York, from which his

work was assigned.

16. Claimant is represented by:

Akiva M. Cohen
Dylan M. Schmeyer
Michael D. Dunford
Kamerman, Uncyk, Soniker, & Klein, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
acohen@kusklaw.com

212-400-4930

17.  Respondent Twitter was a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103. Upon information and belief, Twitter has since merged into Respondent X Corp., a Nevada corporation, with X Corp. as the surviving entity.

18.  Respondent X Holdings I was a Delaware corporation. Upon information and belief, X Holdings I has since merged into X Holding Corp., a Nevada corporation, with X Corp. as the surviving entity.

19.  Respondent Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

20.  On information and belief, Twitter, Respondents are represented by Brian Berry, Cullen Wallace, Ashlee Cherry, Kassia Stephenson and Eric Meckley, of Morgan Lewis & Bockius, LLP, One Market, Spear Street Tower, San Francisco, CA 94105, in connection with this action.

### IV.    FACTUAL BACKGROUND

#### A.  Nick Was a Dedicated Twitter Employee

21.  Nick was employed by Twitter as a Lead Program Manager.

22.  Nick accepted his position with Twitter on or about October 27, 2020, began work on or about November 30, 2020, and remained continuously employed by Twitter until he was laid off on January 4, 2023.

23.  Twitter made several promises to Nick during the course of his employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

24.  Other promises were made more recently, including promises that, Nick would maintain at least the same base salary and wage rate, that his employee benefits would remain "substantially

comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide

him with a severance package that was at least as favorable as those it had long offered.

25. These promises were, in the period immediately surrounding Elon Musk's takeover of

Twitter, broken.

**B. Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply with the Terms of the Agreement He Voluntarily Entered**

26. Twitter is a popular social media company, both in the United States and around the

world. As of October 25, 2022, Twitter had over 350 million global users.

27. Like most large social media companies, Twitter was not without its controversies. This

is particularly true in the challenging and contentious area of content regulation, which is an ongoing

challenge for all large platforms.

28. Some of Twitter's content moderation decisions, such as the decision to suspend

former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by

certain segments of the population. These critiques grew in vehemence over the following year.

29. During that period, Musk emerged as a particularly vociferous critic of Twitter's content

moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and

more hostile to the company's policies over time.

30. He expressed the view that Twitter needed to be 'fixed' and that he could accomplish

this – and would be better at doing so than anyone who was then at Twitter.

31. On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's

stock.

32. Following the disclosure, Musk was offered, but declined, a position on Twitter's Board

of Directors.

33. Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

34. He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

35. After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

36. Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

37. On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

38. On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

39. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

40. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

41. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

42. The deal closed on October 27.

**C.  Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.**

43. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

44. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

45. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

46. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

47. Twitter took these concerns very seriously.

48. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

49. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

50. Twitter therefore took several steps to reassure its employees.

51. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

52. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

53. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the

"**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

54. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

55. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

56. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

57. Moreover, the Severance Stability Promise provided benefits to all involved.

58. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability

in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

59. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

60. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

61. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

62. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

63. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

64. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

65. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

66. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

67. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

68. **Nick** in fact learned that information from Twitter.

69. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

70. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

71. When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

72. In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

73. On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

74. The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o Pro-rated Performance Bonus Plan compensation at target

    o Cash value of equity that would have vested within three months from the separation date

11

        o   A cash contribution for health care continuation.

(bullet points in original).

75. The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

76. Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

77. On October 24, 2022 – just two days before the deal closed --Twitter again repeated the same statement to employees regarding severance.

78. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

79. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

80. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

81. Nick did, in fact, rely upon these representations.

82. The promised severance in fact factored into Nick's decision to remain at Twitter through the closing of the merger.

83. To put it simply, Nick was aware that he had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, he would receive a significant sum as a severance payment, which would help provide him time to find a new job without severe economic pressure.

84. Had it not been for the Severance Stability Promise and Twitter's communications about severance, Nick would have begun the interview process to find a more stable employment situation in mid-May.

85. Instead, Nick chose to remain at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

86. On October 26, 2022, Musk took over as the owner of Twitter.

87. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

88. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

89. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

90. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

91. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

92. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

93. On information and belief, this occurred in some cases within hours of the takeover.

94. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

95.  Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

96.  On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

97.  On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

98.  The next day, roughly half of Twitter's workforce, **including** Nick, were laid off.

99.  The email informing the affected employees that they had been terminated outlined a planned severance package of far less than what Twitter had repeatedly promised – and contractually agreed – to pay.

100.  Specifically, the email advised the employees that "[t]he Company is offering a severance package of one month base pay (or OTE for commission-based employees) to eligible impacted employees."

101.  But the layoffs did not stop there. Over the next several days, Twitter fired further employees, informing them that Twitter had deemed them in violation of some unnamed Twitter policy.

102.  These purported "for cause" terminations were clearly pretextual, and constituted further layoffs.

103.  In the same time-frame, and consistent with conversations Musk had in advance of closing on the merger in which he discussed making changes to employee working conditions in order to induce resignations, Musk then announced that Twitter would be ending its remote work policy and immediately require all workers to report to work at a physical Twitter office.

14

104.    He did so despite Twitter employing workers who lived (and worked remotely) many hours or even hundreds of miles from the nearest Twitter office.

105.    Musk soon updated the policy, indicating that Twitter would "allow" a transition period for remote workers who lived too far from an office to feasibly commute to move to a location closer to the Twitter offices.

106.    Later, the policy morphed into one in which managers could allow their reports to work remotely if they chose to – but would themselves be fired if the employees they allowed to work from home did not perform up to Musk's standards.

107.    As intended, this change to Tweeps' conditions of employment triggered a wave of resignations.

108.    But that wasn't enough. In mid-November, Musk sent another email, with a link to an online form and an ultimatum: Any Twitter employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

109.    As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

110.    And yet again, that still wasn't enough.

111.    After the November 17 layoff, Musk brought in engineers from his other companies – Tesla and SpaceX, to conduct "code reviews" of code written by Twitter employees.

112.    The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

113.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

114.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

115.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

116.    All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

117.    The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

118.    Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

16

119.     On information and belief, Musk routinely violates agreements that would require him to expend money as a matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

120.     In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

121.     For that reason, Nick – along with hundreds (hopefully thousands) of his former colleagues filing similar claims – brings this arbitration to vindicate his rights and recover the amounts Twitter owes him, along with punitive damages, costs, and attorneys' fees as allowed by applicable law.

## V.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Merger Agreement

122.     Nick restates and realleges each paragraph above as if fully stated herein.

123.     Nick is an intended third-party beneficiary[2] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

124.     Twitter has breached the Merger Agreement by refusing to pay Nick the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

125.     X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Nick the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

---

[2] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Nick *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Nick will provide in briefing if and as necessary. Nick raises the issue here as part of his duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

126.     As such, Nick is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### B.  Count Two: (against Twitter) Breach of Oral Contract

127.     Nick restates and realleges each paragraph above as if fully stated herein.

128.     The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current benefits in exchange for each employee's remaining employed at Twitter through the merger.

129.     Nick accepted that offer by continuing to work at Twitter instead of obtaining more stable employment.

130.     Nick provided Twitter with consideration for its promise by continuing to work at Twitter through that period until he was laid off on January 4, 2023.

131.     As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Nick with the severance outlined in the Severance Policy Email, which he fully performed.

132.     Twitter has breached this agreement by refusing to pay Nick the severance outlined in the Severance Policy Email and diminishing the benefits it made available to Nick.

133.     As such, Nick is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### C.  Count Three (in the alternative, against Twitter): Promissory Estoppel

134.     Nick restates and realleges each paragraph above as if fully stated herein.

135.     To the extent that Twitter's communications and Nick's subsequent conduct somehow did not create an enforceable contract between Nick and Twitter, Twitter's

representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

136.    The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

137.    Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

138.    It was reasonable for Nick to rely upon that promise.

139.    Nick did in fact rely upon that promise.

140.    Nick was damaged by that reasonable reliance, in that it negatively impacted his ability to find alternative employment in advance of the merger.

141.    Twitter's promise to provide Nick with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Nick with such severance.

142.    As such, Nick is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D.  Count Four (against Twitter): Breach of Offer Letter**

143.    Nick restates and realleges each paragraph above as if fully stated herein.

144.    On or about October 27, 2020, Nick executed an offer letter from Twitter, which detailed the terms of Nick's employment (the "Offer Letter").

145.    The Offer Letter constitutes a binding contract between Nick and Twitter.

146.    The Offer Letter provides that Nick will be eligible to receive benefits under the terms of Twitter's benefits plans.

147.    Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Nick was entitled to receive the benefit of when Twitter terminated Nick.

148.    Twitter did not provide Nick with severance in accordance with its benefit plan.

149.    As such, Twitter breached the Offer Letter, and Nick is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E.  Count Five (against all Respondents): Fraud**

150.    Nick restates and realleges each paragraph above as if fully stated herein.

151.    In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

152.    Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

153.    In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

154.    On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

155.    Nick did rely upon these representations.

156.    On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

157.    Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that

20

requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

158.    On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

159.    When it laid off Nick, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

160.    As a result of Respondents' fraud, Nick suffered damages.

161.    As such, Nick is entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, punitive damages, costs, attorneys' fees, and penalties as authorized by statute.

162.    In addition, Nick is entitled to an award of punitive damages in an amount greater than any savings Musk and Twitter achieved by virtue of their fraud, an amount that, on information and belief, is at least $500,000,000.00.

163.    On information and belief, award of a punitive damages amount smaller than such savings would be insufficient to deter Twitter and Musk from repeating the fraud.

164.    In that regard, to avoid the prospect of dual recoveries and to the extent that a punitive award of that size is issued, Nick agrees that Twitter and Musk may deduct from such award any punitive damages awarded prior to the issuance of the award in this action to other employees who asserted claims based on the same conduct, and may pay any punitive damages later awarded to such other employees out of such fund.

**F.   Count Six: WARN Act Violations (29 U.S.C.A. § 2101 et seq.)**

165.    Nick restates and realleges each paragraph above as if fully stated herein.

166.    The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

167. On information and belief, Twitter's layoff meets all statutory requirements for a mass layoff under the WARN Act.

168. In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Nick.

169. Instead, Twitter designated the period from November 4, 2022 through January 4, 2023 as a period during which Nick would remain employed but in a 'nonworking' status.

170. However, Twitter has failed to continue to provide the laid-off employees (including Nick) with their full benefits provided to other employees during this period, and is thus in violation of the WARN Act.

171. For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

172. Twitter also provided other "annually refreshing" benefits to its employees.

173. Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees, including Nick, despite those employees continuing to be employed by Twitter on January 1, 2023.

174. Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

175. As a result of Twitter's violation of the WARN Act, Nick is entitled to damages to be proven at hearing, including Nick's benefits for the "Non-Working Notice period window" to which Nick was entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### G.  Count Seven: New York WARN Act Violations

176.    Nick is a remote worker, and thus, for State and Federal WARN Act purposes, **his** single site of employment is the Twitter office to which he was assigned.

177.    Under that standard Nick's single site of employment is Twitter's Albany, New York office.

178.    Both because Nick is a New York-based employee and, separately, because his single site of employment is based in New York, the New York State WARN Act, New York Labor Law Article 25-A et seq ("New York WARN Act") required Twitter to provide Nick with 90 days' notice before it could terminate him, not merely 60 days' notice.

179.    Despite that, Twitter terminated Nick on only 60 days' notice.

180.    As a result of Twitter's violation of the New York WARN Act, Nick is entitled to damages to be proven at hearing, including Nick's salary and benefits for the extra 30 days' notice to which Nick was entitled, the value of any RSUs which would have vested in that 30-day period, the value of any RSU vests which would have been included in Nick's severance had Nick remained employed for that additional 30-day period, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### H.  Count Eight (Against Twitter, X Holdings I, and Musk): Wage Theft (Cal. Labor Code § 201-203, New York Labor Law)

181.    Nick restates and realleges each paragraph above as if fully stated herein.

182.    Under both New York and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

183.    Under New York and California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

184.    Under California law, engaging in such wage theft triggers waiting time penalties in the amount of 1/365th of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

185.    Under New York law, engaging in such wage theft triggers a liquidated damages penalty of up to 100% of the total amount of the wages determined to be due.

186.    Under California law, the definition of "employer" against whom Nick may bring claims for wage theft includes not only Twitter, but X Holdings I and Musk as an individual.

187.    As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Nick's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

### I.    Count Nine (Against Musk): Piercing the Corporate Veil

188.    Nick restates and realleges each paragraph above as if fully stated herein.

189.    There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

190.    Musk, through X Holdings I, owns more than 50% of Twitter.

191.    Musk dominates Twitter's decision-making and operations.

192.    For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

193.    Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

194.    Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

195.    At Musk's direction, Twitter restored Anglin's account.

196.    Twitter has engaged in other content moderation decisions at Musk's whims.

197.    For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

198.    After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

199.    Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

200.    On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

201.    On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

202.    On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

203.    Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

204.    On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

205.    On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

206.    Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

207.    As such, Nick is entitled to an award holding Musk personally liable for any amounts awarded on his other claims.

### J.   Count Ten: Employment Discrimination

208.    Nick restates and realleges each paragraph above as if fully stated herein.

209.    Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

210.    For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

211.    Despite those laws, the anecdotal evidence currently available to Nick indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

212.    Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

213.    Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

214.    Compounding these warning signs, Twitter has refused to respond to Nick's request that it voluntarily turn over demographic information on the mass layoff to allow Nick to confirm or rebut the picture painted by the available anecdotal information.

215.    On information and belief, the entire layoff was conducted in a discriminatory manner.

216.    On information and belief, Nick was included in the mass layoff to reduce the chances that the layoff as a whole would be seen as the product of a discriminatory process.

217.    The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

218.    As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Nick is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

## VI.    REQUEST FOR RELIEF

219.    Wherefore, Nick Tapalansky respectfully requests that the Arbitrator:

    a.   Award Nick compensatory damages in an amount to be proven at hearing;

    b.   Award Nick penalty damages under the WARN Act and New York WARN Act and federal and state antidiscrimination law;

    c.   Award Nick liquidated damages under California Labor Code and New York Labor Law;

    d.   Award Nick waiting time penalties under the California Labor Code;

    e.   Award Nick punitive damages in the amount of $500,000,000.00;

    f.   Award Nick costs and attorneys' fees as allowed by statute;

    g.   Award Nick pre- and post-judgment interest; and

    h.   Award Nick such other and further relief as the Arbitrator deems appropriate.

Respectfully Submitted,

_/s/ Akiva M. Cohen_
Akiva M. Cohen

KAMERMAN, UNCYK, SONIKER &
KLEIN, P.C.
1700 Broadway
New York, New York 10019
(212) 400-4930
acohen@kusklaw.com
Dylan M. Schmeyer
dmschmeyer@kusklaw.com
Michael D. Dunford
mdunford@kusklaw.com

# DISPUTE RESOLUTION AGREEMENT

**This Dispute Resolution Agreement is a contract and covers important issues relating to your rights. It is your responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company or to refrain from doing so if that is your choice.**

**You can choose to opt out of this Agreement – you have 30 days to opt out.**

## 1.  How This Agreement Applies

This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce. If the FAA is found not to apply, then this Agreement is enforceable under the laws of the state in which you ("Employee") are employed at the time you enter into this Agreement. This Agreement applies to any dispute arising out of or related to Employee's employment with Twitter, Inc. or one of its affiliates, successor, subsidiaries or parent companies ("Company") or termination of employment, and survives after the employment relationship terminates. It can only be revoked or modified by a writing, signed by both you and Twitter, Inc.'s Chief Executive Officer, which specifically states an intent to revoke or modify this Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse Employee or the Company from using the Company's existing internal procedures for resolution of complaints.

Disputes covered by this Agreement include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Except as it otherwise provides or required by law, this Agreement also applies, without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim.

Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. **By entering into this Agreement, the parties are waiving a trial by jury.**

## 2.  Limitations On How This Agreement Applies

This Agreement does not apply to claims for workers compensation, state disability insurance and unemployment insurance benefits.

Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov) the U.S. Department of Labor (www.dol.gov) the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

Disputes that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) are excluded from the coverage of this Agreement.



NT
NT

1

## 3. Selecting The Arbitrator

The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted. If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules"). The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/. Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources. The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

## 4.  Starting The Arbitration

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company shall be provided to the attention of the Company's Legal Department, Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

## 5.  How Arbitration Proceedings Are Conducted

Employee and the Company agree to bring any claim in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Discovery and conduct of the arbitration hearing shall be governed by the JAMS Rules applicable to discovery and arbitration hearing procedures.

**You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis.** Employee and the Company agree that any arbitration will be limited to the claims between Employee and the Company individually. Employee acknowledges and agrees that Employee and the Company are each waiving the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding ("Class Action Waiver"). This Class Action Waiver shall not apply to California Private Attorney General Act claims brought against the Company to the extent a Class Action Waiver is not legally enforceable as to those claims. Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the scope, applicability, enforceability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which: (1) the claim is filed as a class, collective, or representative action and (2) there is a final judicial determination that the Class Action Waiver is unenforceable as to any claims, the class, collective, and/or representative action on such claims must be litigated in a civil court of competent jurisdiction, but the Class Action Waiver shall be enforced in arbitration on an individual basis as to all other claims to the fullest extent possible and the claims to be litigated in court shall be stayed pending the completion of the arbitration on the arbitrable claims.

## 6.  Paying For The Arbitration

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.



_NT_
NT

## 7.  The Arbitration Hearing And Award

The parties will arbitrate their dispute before the Arbitrator, who shall confer with the parties regarding the conduct of the hearing and resolve any disputes the parties may have in that regard. The Arbitrator shall apply substantive law as applicable to the claims, and may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator; no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Unless otherwise agreed by the parties in writing, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, within 30 days after the date of closing of the arbitration hearing or the completion of post-hearing briefing, whichever is later. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

## 8.  An Employee's Right To Opt Out Of Arbitration

**Arbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement.** The Employee must submit a signed and dated statement on a "Dispute Resolution Agreement Opt Out Form" ("Form") that can be obtained from the Company's Human Resources Department at hrlegaldocs@twitter.com. In order to be effective, the signed and dated Form must be returned to the Human Resources Department within 30 days of the Employee's receipt of this Agreement. An Employee who timely opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company. An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.

## 9.  Non-Retaliation

An employee will not be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Human Resources Department.

## 10.  Enforcement Of This Agreement

This Agreement is the full and complete agreement relating to the formal resolution of covered disputes. Except as stated in paragraph 5, above, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is deemed to be unenforceable, the Company and Employee agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration. Nothing in this Agreement modifies the at-will nature of Employee's employment with the Company.

**AGREED:**

Leslie Berland, Head of People
TWITTER, INC.

**By signing below, I acknowledge and agree to the terms of this Dispute Resolution Agreement, and confirm I am aware of my right to opt out per the terms of this Agreement:**

EMPLOYEE NAME PRINTED  Nick Tapalansky

EMPLOYEE SIGNATURE  *Nick Tapalansky*
Nick Tapalansky (Oct 27, 2020 11:48 EDT)

Date:  Oct 27, 2020

